PARAMOUNT-RICHARDS THEATRES, INC., et al. *v*. CITY OF
HATTIESBURG.

Division A.   Dec. 11, 1950.

No. 37669  (49 So. (2d) 574)

Brandon, Brandon, Hornsby & Handy, Green, Green & Cheney, Heidelberg & Roberts, Earle L. Wingo and Gibbons Burke, for appellants.

Alfred Moore and Edward J. Currie, for appellee.

Lee, J.

Paramount-Richards Theatres, Inc., and others have appealed from a decree of the Chancery Court of Forrest County, enjoining them, on the complaint of the City of Hattiesburg, from operating moving picture shows after the hour of 6:00 P. M. on Sundays.

During the period from 1941 to 1949, picture shows in the City of Hattiesburg were operated without molestation. On June 23, 1949, after a change in the city administration on the first of the year, the mayor instructed the chief of police to enforce the Sunday laws, beginning Sunday, June 26. Due notice was given to the managers of the six theatres not to operate their shows after 6:00 P. M. on such days. Those affected were Saenger, Lomo, Rose and Buck, owned and operated by Paramount-Richards Theatres, Inc., Royal, owned and operated by R. O. Sigler and William A. Pruitt, and Star, owned and operated by C. N. Dossett and R. B. Dossett.

All shows operated on Sunday, June 26, after 6:00 P. M. and until about 11:00 P. M. The managers were arrested, but were permitted to make bond at their respective places. Affidavits were made and lodged with the police justice of the city.

A stormy conference between the mayor and commissioners and the representatives of the theatres was held on June 30, but ended without results.

On Sunday, July 3, the theatres again operated after

6:00 P. M. Sixty-six arrests were made, and large crowds assembled. Affidavits were lodged with the police justice, and convictions resulted on July 8.

On July 9, the managers of the theatres filed a petition in the Chancery Court of Forrest County against the mayor, commissioners and chief of police, to enjoin the enforcement of the Sunday laws against them.

On Sunday, July 10, all theatres again operated after 6:00 P. M. People gathered along the sidewalks and overflowed onto the steps and grounds of the city hall. Twelve arrests were made, and convictions therefor had in the police court.

The mayor, commissioners and the chief of police answered the petition filed against them, and made their answer a cross-bill. However, when the cause came on for hearing before the chancellor on July 15, some kind of settlement was thought to have been worked out. Hence the city withdrew its cross-bill, and the cause was dismissed.

However, on Sunday, July 17, all theatres again operated after 6:00 P. M. Twelve arrests and convictions resulted therefrom.

Again, on July 21, another meeting between the city officials and the representatives of the theatres was held, but to no avail. The theatre people gave notice of their determination to run the shows, and of their final decision not to close.

By reason of this ultimatum, and the apprehension of violence against the authorities in their determination to require observance of the law, the whole police force was called to duty on Sunday, July 24. The focus of the defiance centered in and around the Saenger theatre, which was only about 50 feet from the city hall. A large crowd gathered and extended onto the grounds of the city hall. Violence was in the air. The officers were booed, and some were struck by thrown tomatoes. Several couples danced in the aisles near the organ. The owners and representatives of the various theatres, together with their attorneys, were present. As one projectionist was

arrested and taken to the city hall to make bond, another took his place. The arrested projectionist, after making bond, returned and began anew his work. Eighty-five arrests were made on that occasion. It was with great difficulty that traffic passed over the street. One fire station was almost blocked off. The overflowing crowd tramped the flowers, shrubbery and grounds of the city hall. The mayor testified that he was alarmed over conditions, and expressed fear of bloodshed.

During the five Sundays of operation, 185 arrests were made. Some of the first prosecutions were dismissed; but a grand total of 175 were convicted in the police court. Appeals were promptly taken to the county court, and the shows went on. Following the episode of July 24, the city officials, on July 28, filed their bill for injunction.

The chancellor, after hearing all of the evidence, in his opinion, observed that ''this Court is confronted with a situation which, according to the proof in this case, threatens the peace and welfare of the city, and which, if continued as it did on Sunday night, July 24, would perhaps produce violence and some innocent person or persons would be killed or injured needlessly. When law and order ends, anarchy and vandalism begins. . . . All of these matters have been carefully considered by the Court, and after careful consideration, the court is of the opinion that the operation of the picture shows in defiance of the law is a nuisance and should be enjoined . . . .''

The statutes which come under review in the determination of this controversy are Sections 2368 and 2369, Code of 1942; and Section 2370, Code of 1942, as amended by Chapter 401, Laws of 1948. They are as follows:

Section 2368, ''If any person, on the first day of the week, commonly called Sunday, shall himself labor at his own, or any other trade, calling, or business, or shall employ his apprentice or servant in labor or other business, except it be in the ordinary household offices of daily necessity, or other work of necessity or charity, he shall, on conviction, be fined not more than twenty

dollars for every offense, deeming every apprentice or servant so employed as constituting a distinct offense; . . ."

Section 2369: "A merchant, shop-keeper, or other person shall not keep open store, or dispose of any wares or merchandise, goods, or chattels, on Sunday, or sell or barter the same; and every person so offending shall, on conviction, be fined not more than twenty dollars for every such offense; but this shall not apply to apothecaries or druggists who may open their stores for the sale of medicines."

Section 2370, as amended:

"If any person shall engage in, show forth, exhibit, act, represent, perform, or cause to be shown forth, acted, represented or performed, any tricks, juggling, sleight of hand, or any bearbaiting, any bull-fighting, horse-racing, or cock-fighting, or any such like show or exhibit, on Sunday, every person so offending shall be fined not more than fifty dollars ($50.00). Provided, that this section shall not be construed to prohibit the showing of moving picture shows, baseball, football, basket ball, tennis and golf games, between the hours of 1:00 o'clock p. m. and 6:00 o'clock p. m., on Sundays.

"Section 2. That the showing of moving picture shows and plays, and baseball, football, basket ball, tennis, golf and similar forms of entertainment and recreation, between the hours of 1:00 o'clock p. m. and 6:00 o'clock p. m. on Sundays is legal . . ."

Ordinance No. 267 of the City of Hattiesburg makes all offenses under the penal laws of the State, amounting to misdemeanors, offenses against the City of Hattiesburg, when committed within the corporate limits thereof, with like punishment, but not in excess of the maximum penalty which may be imposed by a city.

Among the contentions advanced, appellants say: (1) The amendment of Section 2370 by Chapter 401, supra, validated picture shows for the whole day. (2) The city was without power to sue herein, and equity had no jurisdiction to enjoin. (3) Only one arrest for a given

Sunday violation could be made, and the city caused the tumult by unlawful methods. (4) There was no right of joint action against all, and quo warranto was the sole remedy against the corporate defendant. And (5) the Code sections are in contravention of provisions of the State and Federal Constitutions; but if they are fair, there was discrimination in their enforcement.

Since these statutes, supra, by this appeal, are under attack, it is well, by preface, to consider briefly the underlying cause and philosophy of their enactment.

The Sunday laws have a divine origin. Blackstone (Cooley's) Par. 42, page 36. After the six days of creation, the Creator Himself rested on the Seventh. Genesis, Chapter 2, verses 2 and 3. Thus, the Sabbath was instituted, as a day of rest. The original example was later confirmed as a commandment when the law was handed down from Mt. Sinai: "Remember the Sabbath day, to keep it holy. Six days shalt thou labor, and do all thy work: But the seventh day is the Sabbath of the Lord thy God: in it thou shalt not do any work, thou, nor thy son, nor thy daughter, thy manservant, nor thy maidservant, nor thy cattle, nor thy stranger that is within thy gates: For in six days the Lord made heaven and earth, the sea, and all that in them is, and rested the seventh day: wherefore the Lord blessed the Sabbath day, and hallowed it." Exodus Chapter 20, verses 8-11. The day had both physical and spiritual significance. And through the succession of the ages, men have consecrated it as a day of rest from their labors, thereby bringing relaxation to their minds and bodies. Besides, they were afforded frequent opportunity to contemplate the glorious works of creation and to adore their Creator. ██ █ "Morality, religion and education are the three main pillars of the state, and the substance of all private good. They should, therefore, be objects of primary regard by the laws . . .". Moore v. State, 48 Miss. 147, 161. The State may destroy whatever tends to undermine public morals. Park v. State, 42 Nev. 386, 178 P. 389, 3 A. L. R. 75.

Philosophers, moralists and statesmen of every age and nation have concurred in the necessity for periodical cessation from labor. The infidel, who denies the existence of Deity; the agnostic, who professes no knowledge on the subject; the Christian, who is a follower of the lowly Nazarene; the Jew, who owes his allegiance to Jehovah; and the Mohammedan, who looks to Allah—regardless of creed or absence of creed—all agree that such cessation from labor advances the general welfare, protects labor, and promotes the moral and physical well-being of society. How then can modern mortal man have the effrontery to arrogate to himself all knowledge and wisdom, and, by one fell swoop, abolish the wisdom of the ages! Our great country is denominated a Christian nation. Rector of the Holy Trinity Church v. United States, 143 U. S. 457, 12 S. Ct. 511, 36 L. Ed. 226. We imprint "In God we trust" on our currency. Our state has even sometimes been referred to by cynics as being in the "Bible Belt". It cannot be denied that much of the legislative philosophy of this state and nation has been inspired by the Golden Rule and the Sermon on the Mount, and other portions of the Holy Scriptures. How then can one dogmatically proclaim that there is no causal connection between the deep spirituality of our people and their unbounded material progress and prosperity?

There is practically no authority in opposition to the power of the legislature to provide for a cessation from labor. The time therefor is vested in the legislative discretion. Hennington v. Georgia, 163 U. S. 299, 16 S. Ct. 1086, 41 L. Ed. 166; Ex parte Newman, 9 Cal. 502, 529; Bloom v. Richards, 2 Ohio St. 387, 392; Petit v. Minnesota, 177 U. S. 164, 20 S. Ct. 666, 44 L. Ed. 716.

Prior to the amendment of Section 2370, Code of 1942, by Chapter 401, Laws of 1948, the operation of a moving picture show on Sunday was unlawful. Crawford v. City of Pascagoula, 123 Miss. 131, 85 So. 181. The reason there given was that it had a tendency to profane the Sabbath. The court could have also condemned such

operation on the additional ground that it was in violation of the statutes which required a cessation from labor. Rosenbaum v. State, 131 Ark. 251, 199 S. W. 388, L. R. A. 1918B, 1109; State v. Ryan, 80 Conn. 582, 69 A. 536; City of Clinton v. Wilson, 257 Ill. 580, 101 N. E. 192; Capital Theater Co. v. Commonwealth, 178 Ky. 780, 199 S. W. 1076; 50 Am. Jur. 803, 804, 808.

But under contention (1) it is said that, although the legislature had the power to prohibit all work on Sunday, yet, when it amended Section 2370, supra, so as to permit shows to operate between 1:00 and 6:00 P. M., the statute was then and there rendered invalid and unenforceable. ██ ██ This contention is untenable for if it was lawful to prohibit work for the 24 hour period constituting Sunday, the legislature, by an act of grace in allowing such shows during certain hours of that period, did not thereby release picture show people from observance of the Sunday laws.

This Court, in State v. J. J. Newman Lumber Co., 102 Miss. 802, 59 So. 923, 45 L. R. A., N. S., 851 held that the legislature had the right and power to limit work to 10 hours a day for 6 days in the week as to a particular industry. Where wine and beer can be lawfully sold in the state, the governing authority of a municipality and the board of supervisors of a county, according to statute, may prescribe the hours of opening and closing and for such other measures as will promote public health, morals and safety. Section 10224, Code of 1942. The prohibition against sale of beer in close proximity to a church has been upheld. Ford v. Easterling, 183 Miss. 575, 184 So. 153, 119 A. L. R. 634. Besides, the legislature primarily has the duty of determining the means by which the welfare of the citizens can be promoted and accomplished. Albritton v. City of Winona, 181 Miss. 75, 178 So. 799, 115 A. L. R. 1436. There seems to be no good reason why the legislature, in its wisdom in fixing the public policy of the state, may not legalize hours in which work may be done on Sunday. Consequently, the amendment of said Section 2370 by Chap-

ter 401, Laws of 1948, did not legalize the operation of picture shows on Sunday at any other hours except between 1:00 and 6:00 P. M.

In response to contention (2), attention is directed to Section 3425, Code of 1942, with reference to the powers of the governing authorities of a city, which provides in part: "To restrain, prohibit and suppress . . . desecration of the Sabbath day, . . . disorderly practices, disturbance of the peace . . . .". ██ ██ The repeated operation of a picture show in violation of the Sunday laws has been denominated a common nuisance. Graham v. State, 134 Tenn. 285, 183 S. W. 983. "A public exhibition of any kind that tends . . . to a disturbance of the peace or of the general good order and welfare of society, is a public nuisance." 39 Am. Jur. 346. See also 66 C. J. S., Nuisances, Section 110, page 866, where it is said: "As a general rule, the fact that the nuisance against which equitable relief is sought constitutes a criminal or penal act does not oust the jurisdiction of equity or cause it to withhold injunctive relief; but where a criminal prosecution will afford an *adequate* remedy an injunction will generally not be granted." (Emphasis supplied.) In City of New Orleans v. Liberty Shop, 157 La. 26, 101 So. 798, 799, 40 A. L. R. 1136, it was said: "An injunction should not be issued to prevent the commission of a crime, if the only reason for preventing it is that it is a crime. But, ██ if the wrong complained of is injurious to property interests or civil rights, *or if it is a public nuisance, either in the opinion of the court* or in virtue of a statute or an ordinance making it a nuisance, the fact that it is also a violation of a criminal statute or ordinance does not take away the authority of a court of civil jurisdiction to prevent the injury or abate the nuisance." (Emphasis supplied.) Under many circumstances, injunctions will lie to prevent repeated and continuous violations of a penal statute, and to avoid a multiplicity of criminal prosecutions. Kentucky State Board of Dental Examiners v. Payne, 213 Ky. 382, 281 S. W. 188; Commonwealth ex

rel. Grauman v. Continental Co., 275 Ky. 238, 121 S. W. (2d) 49.

In State ex rel. Rice v. Allen, 180 Miss. 659, 177 So. 763, 764, it was said: "Though equitable action is never predicated on the prevention of crime, as such, it is also true that the fact that conduct is punishable criminally does not constitute an adequate remedy so as to bar equitable relief . . .". This principle was followed in Southern Bus Lines, Inc., v. Amalgamated Ass'n., 205 Miss. 354, 38 So. (2d) 765.

██ The Court found from all the facts that the operation of the picture shows in defiance of the law was a nuisance, and that the situation would grow worse unless enjoined. As a matter of fact, the defense to this suit showed that the city was powerless to stop the violations of the law, or secure the peace, or abate the nuisance except by injunction. We conclude, therefore, that the city had the right and power to bring this suit, and that the chancery court was warranted in taking jurisdiction of the same, and granting the relief prayed for.

The consideration of contention (3) leads us to the following observations: ██ ██ Under the statutes and ordinance in question the manager of a theatre was clearly subject to arrest (a) for working himself, (b) for the employment of each servant, and (c) for the unlawful operation of the picture shows. Each employee was likewise subject to arrest for working on Sunday, and for aiding and abetting in the unlawful operation of the show. It is contended that only one penalty can be imposed for pursuing one's work on Sunday. It might be conceded that if a prosecution were commenced on Monday because of work on the previous Sunday, the matter would be dealt with as a single offense, stemming from a single impulse. But, "If successive impulses are separately given, even though all unite in swelling a common stream of action, separate indictments lie." Blockburger v. United States, 284 U. S. 299, 302, 52 S. Ct. 180, 181, 76 L. Ed. 306; Wharton, Criminal Law, 11th Ed. par. 34. In the case here, the arrest of a projectionist

stopped the show, and stopped his work. When he made bond, returned to the show, and started to work again, this subsequent act was a "successive impulse", separately given, which swelled the common stream of action, and subjected him to arrest again. Consequently, the principles announced in Crepps v. Durden, 2 Cowp. 640, 90 Eng. Rep. 1283, and the cases following it are inapplicable.

It can hardly by contemplated that such a persistent course of violating the law will often occur. Most people, when arrested and charged with a law violation, will abstain from like conduct until such prosecution is terminated. ██ Mere belief, though honestly formed, that the law does not prohibit a given course of conduct, does not license or excuse an offender, after his arrest therefor and release on bond, in immediately continuing such conduct. No toleration of such practice can be permitted, if we would escape a reign of terror and anarchy. ██ The police officers did not violate the law in making these multiple arrests. Policemen of a city are authorized to make arrests. Section 2467, Code of 1942. "Arrests for criminal offenses, and to prevent a breach of the peace, or the commission *of a crime, may be made at any time or place*" (Emphasis supplied.) Section 2469, Code of 1942. "An officer or private person *may arrest* any person *with out warrant, for an indictable offense committed,* or a *breach of the peace threatened or attempted in his presence . . .*". Section 2470, Code of 1942. (Emphasis supplied.) Baldwin v. State, 175 Miss. 316, 167 So. 61; Fulton v. City of Philadelphia, 168 Miss. 30, 148 So. 346; Thomas v. State, 208 Miss. 264, 44 So. (2d) 403. Since these violations occurred in their presence, the policemen would have been derelict in the discharge of their duties, if they had failed to make arrests. The proper place for the appellants to assert or defend their constitutional or other rights was in court, and not at the picture shows.

Our conclusion on contention (4) is that ██ the evidence showed a complete understanding and agree-

ment between the owners and/or their managers and representatives to run the shows, and that they were all acting in concert in so doing. Section 2056, Code of 1942, defines conspiracy. While the chancellor deemed the evidence insufficient for that purpose, we think it conclusively established a conspiracy in which all actively participated. Obviously, joint action was proper. Of course, if the city had sought the forfeiture of the corporate franchise such action could have been brought only by the Attorney General. Kennington-Saenger Theatres v. State ex rel. District Attorney, 196 Miss. 841, 18 So. (2d) 483, 153 A. L. R. 883. But the city was not seeking the aid of such a violent remedy. It did not wish to drive the picture shows out of town. It was merely seeking to have them comply with the law.

With reference to contention (5), the evidence showed that there was no discrimination as between the picture show operators. All were treated alike. Besides, orders were issued for the enforcement of the Sunday laws, and it appeared that a bona fide effort was undertaken in that regard. Moreover, such orders were generally observed and obeyed except by the appellants. At least no other person had to be arrested for a second offense. In the case of Yick Wo v. Hopkins, 118 U. S. 356, 6 S. Ct. 1064, 30 L. Ed. 220, the petitioner and more than 150 other Chinamen were arrested for operating their laundries in nonbrick buildings without special consent while 80 odd others, operating under similar conditions, were left unmolested. In other words, there was rank discrimination against the Chinese. The principle there announced is wholly inapplicable to the facts of this case. We are, therefore, unable to see in what manner these statutes, or the manner of their enforcement, contravene any provision of either the State or Federal Constitutions.

Affirmed.