**CITY OF JACKSON, Plaintiff,**

v.

**Dean MORLEY and Margaret Laurence, Defendants.**

**Civ. A. No. J84–0108(L).**

United States District Court, S.D. Mississippi, Jackson Division.

April 5, 1985.

---

John Hedglin, Jackson, Miss., for plaintiff.

Crane D. Kipp, Shell, Buford, Bufkin, Callicutt & Perry, Jackson, Miss., for defendants.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

The building commonly known as the King Edward Hotel (King Edward) is a twelve story building that was built approximately 60 years ago in what is now the western section of downtown Jackson, Mississippi. The block in which the King Edward is located is occupied primarily by office buildings. The railroad station, several stores and a hotel are situated across the street. The King Edward had been vacant for approximately thirteen years when the defendants, Dean Morley and Margaret Laurence, acquired it in February 1981. The plaintiff, the City of Jackson (City), brought suit in the Chancery Court of the First Judicial District of Hinds County, Mississippi, alleging that the King Edward was "being maintained in such a manner so as to constitute a public nuisance." The complaint specifically referred to the building's inoperable standpipe system, accumulation of combustible waste, loose and falling window screens, and inadequate securing of the building. The defendants removed the action to this court with jurisdiction premised on diversity of citizenship. *See* 28 U.S.C. § 1332.

Maurice Joy, Fire Marshall of the City of Jackson Fire Department, testified from his records that his department has conducted inspections and found several problems since the King Edward has been vacant. Upon finding the building to be unsecured on February 2, 1982, the fire department discovered that the building had been sold to the defendants. The building was also inspected on June 23, 1983, and the report of that inspection, a copy of which was mailed to the defendants' attorney, noted that the standpipe was inoperable, that an elevator was missing [1] and that combustible waste was found on the fourth floor. By letter dated July 26, 1983, Captain Danny P. Stegall of the

---

1. Warnie Kennington explained the significance of the missing elevator door as well as the absence of chase panels. Both are hazards to fire fighters who may fall down the shafts in a fire. Additionally, the shafts provide vertical ventilation that would substantially increase the intensity of a fire.

Jackson Fire Department thanked defendants' attorney for allowing members of the department to tour the building [2] and also noted the missing elevator door and accumulation of combustible waste.

On January 10, 1984, Joy and Stegall entered the building through a broken window [3] and found, among other things, debris in the kitchen and a still inoperable standpipe system. Stegall again wrote defendants' attorney on February 9, 1984 [4] and stated that the inoperable standpipe was in violation of the City Fire Code.[5] Stegall also stated that the department would approve use of a dry system rather than a wet standpipe system since the building was vacant.[6]

The building was again inspected March 20, 1985, a few days before the trial of this case, by Fire Marshall Joy, Captain Stegall and Warnie Kennington, Director of Building and Permit Department for the City of Jackson. Upon entering the building, the inspectors found two scavengers and promptly called the police. The inspection revealed that elevator doors were still open and the standpipe remained inoperable.[7]

In *Green v. State,* 212 Miss. 846, 56 So.2d 12, 15 (1952), the Mississippi Supreme Court stated:

2. The defendants have issued a standing offer for members of the fire department to tour the building. The purpose of the tours is to enable fire department personnel to acquaint themselves with the design of the building.

3. The defendants contend that the broken window found on January 10, 1984 was the window broken by the fire department when responding to a false alarm in December 1983.

4. This suit was filed January 12, 1984. Defendants argue that they had no notice of the inoperable standpipe until after the suit was filed. However, the report of the June 23, 1983 inspection noted the inoperable system and a copy of that report was mailed to the defendants' attorney.

5. The Fire Code of the City of Jackson provides in part:
18.209 Wet Standpipes, Required.
    *   *   *   *   *   *
    b. Buildings shall be equipped with standpipes as follows:

No doubt a nuisance is public if it affects the entire community or neighborhood, or any considerable number of persons. Furthermore, it undoubtedly is true that a nuisance is a public one if it occurs in a public place or where the public frequently congregate, or where numbers of the public are likely to come within the range of its influence; and it seems to be sufficient to constitute acts or conditions of a public nuisance if injury and annoyance are occasioned to such part of the public as come in contact therewith.

*Id.,* quoting *State v. Turner,* 198 S.C. 487, 18 S.E.2d 372, 375. *See also Dow v. Town of D'Lo,* 169 Miss. 240, 152 So. 474, 476 (1934) (on suggestion of error).

■ The City has alleged first that the existence of an inoperable standpipe constitutes a public nuisance.[8] The standpipe, as defined by the Fire Code of the City of Jackson, "is an arrangement of piping, valves, hose outlets and allied equipment installed in a building or structure with outlets located in such a manner that water can be discharged through hose and nozzles for the purpose of extinguishing fire." Without an operable standpipe system in a building, firefighters must attach their hoses to an outside hydrant and carry them up the stairwell to the location of the fire.

1. buildings two (2) stories or more in height. The fire code is applicable "to new and existing conditions." Section 1.03, Fire Code of the City of Jackson.

6. Defendants object to the use of a wet standpipe system since the building is unheated and the pipes would, therefore, possibly freeze and burst.

7. The inspectors also found new debris and combustible waste. The defendants represented at trial that this debris had been removed.

8. By memorandum opinion dated November 15, 1984, the court granted the plaintiff's motion for partial summary judgment on the issue of the inoperable standpipe. Prior to the trial, the court informed the parties that it would consider evidence on the question of whether the standpipe constituted a public nuisance and whether issuance of a mandatory injunction in abatement thereof was appropriate.

Firefighters could also carry hoses up a ladder and inside the building through a window if there were no operable standpipes; however, Jackson's ladders reach only six to seven floors and a fire could not be fought effectively on the upper floors of the King Edward. Such an operation obviously wastes valuable time and increases the risk to the firefighters. In addition, the ability of the firefighters to fight the fire effectively is minimized, thereby placing in jeopardy the safety of the surrounding buildings, their occupants and the general public. Accordingly, the court finds the absence of an inoperable standpipe system to be a public nuisance.

█ The City also contends that the King Edward is a nuisance because of the accumulation of combustible waste in the building. The evidence shows that the defendants have removed the combustible waste when its presence was reported to them. While combustible waste increases the risk of fire in a vacant building, the court cannot conclude that it constitutes a public nuisance when the defendants take prompt action to remove it.[9] Likewise, the plaintiff's contention that loose and falling screens constitute a nuisance must also fail because the defendants have apparently taken prompt action to repair the screens.

█ The plaintiff finally argues that the building is inadequately secured and attracts vagrants who increase the risk of fire, which threatens the safety of legitimate occupants of the neighborhood. The evidence does not support the plaintiff's contention that the building is inadequately secured.[10] Sam Bell, President of County Security Patrol, testified that his employees have patrolled the area three times every night since January 1983. If an opening is found, the building is checked for intruders and then resecured.[11] Captain Stegall testified that he met two men in the building during the March 20, 1985 inspection and had also seen evidence indicating that people had been unlawfully in the building. In sum, the evidence demonstrates that the defendants make a reasonable effort to secure the premises and fails to show that any deficiencies in security have caused an increased threat of fire sufficient to constitute a public nuisance.[12]

█ Although not mentioned in the complaint, the plaintiff has also raised the issue of whether the substantial accumulation of pigeon waste in the upper floors constitutes a nuisance.[13] In his deposition, which was admitted into evidence, Dr. Donald Williamson stated that the presence of pigeon waste has not been conclusively established to be a health hazard. He further opined that any danger was only to people staying in the building for an extended time and that he would enter the building for a short period without worry.[14]

9. The court does not imply that a finding of a public nuisance can always be avoided by merely responding to official requests without any affirmative action.

10. The city also contends that the building is not adequately maintained. In August 1984, defendants were notified of the presence of a potentially explosive gas which appeared to be emanating from the King Edward. The defendants discovered that the problem resulted from the failure of a pump in the basement of the building. They repaired the pump and have taken steps to prevent a recurrence. The court finds this to be an isolated incident which was promptly remedied by the defendants and not indicative of a pattern of inadequate maintenance.

11. Bell recounted two instances in which he had discovered intruders in the building. He found a man who was apparently drunk and, on another occasion, several architectural students.

12. Defendants introduced into evidence a computer printout of crimes reported and/or investigated in the vicinity of the King Edward and an analysis thereof. The evidence was admitted after the court noted that the plaintiff had not raised the issue of the character of the neighborhood in its case in chief. The defendants' exhibit indicates that the King Edward is located in a relatively high crime area but this is insufficient proof of a nuisance.

13. The parties have stipulated that there is a substantial accumulation of pigeon waste in the top floors of the King Edward.

14. The evidence does not establish that any present danger would be substantially increased in the event of a fire. Morley testified that

Accordingly, the court cannot conclude that the accumulation of pigeon waste constitutes a public nuisance.

■ Having determined that only the absence of an operable standpipe system is a public nuisance, the court now considers the remedy available. In *Paramount-Richards Theaters, Inc. v. City of Hattiesburg*, 210 Miss. 271, 49 So.2d 574 (1950), the City filed suit to enjoin the operation of movie theaters on Sunday. A new city administration had recently given notice that the Sunday laws would be enforced. The theater owners did not comply and the City made 185 arrests during five Sundays. The defendants questioned the court's jurisdiction to enjoin their actions but the court stated:

> Under many circumstances, injunctions will lie to prevent repeated and continuous violations of a penal statute ... The court found from all the facts that the operation of the picture shows in defiance of the law was a nuisance, and that the situation would grow worse unless enjoined. As a matter of fact, the defense to this suit showed that the city was powerless to stop the violations of the law, or secure the peace, or abate the nuisance except by injunction.

*Id.* 49 So.2d at 579. Such is the situation here. Dean Morley, one of the defendants, testified that he and Margaret Laurence decided not to repair the standpipe pending resolution of this suit.[15] In other words, the defendants intend to remain in violation of the law until ordered to do otherwise by this court. The plaintiff, therefore, clearly had no adequate remedy at law.

The plaintiff has also established that the inoperable condition of the standpipe seriously jeopardizes the public safety.[16] The actual injury contemplated is, of course, dependent on the event of a fire in the King Edward. The defendants argue that the standpipe is, therefore, if a nuisance at all, merely an anticipatory nuisance and cannot be enjoined. The court agrees that since the King Edward is not currently ablaze, the dangers are not actually present at this time. However, the court finds that, at times, despite reasonable efforts by the defendants, the King Edward presents a substantial risk of fire. The evidence indicates that the building is used for shelter by certain people who have apparently started fires in the building.[17] That those fires have not spread in the past is no reason to ignore their potential danger. The evidence also shows that combustible waste is periodically found in the building and that on several occasions elevator shafts and pipe chases have been found open, thereby increasing the intensity of a fire should one start.[18] While the court has found that these conditions do not constitute a public nuisance in and of themselves, they do substantially increase the risk of an intense fire that would endanger the public. This increased risk of fire is the danger that justifies the issuance of an injunction to require the defendants to repair the standpipe.

The plaintiff seeks to require the defendants to expend a considerable amount of money to install an operable standpipe system. The injunction is mandatory in nature and such

> should never issue unless the right to it is so clearly and certainly shown that

certain precautions against spread of the pigeon waste would be required in the event of renovation or demolition of the building.

15. The defendants have corrected other deficiencies pointed out by the fire department and the complaint.

16. The defendants argue that only firemen engaged in the fighting of a fire in the King Edward are in danger and that this group of people does not constitute the public for purposes of a public nuisance. While the court finds that firemen are in particular danger, the court also concludes that the general public would be endangered by a fire in the King Edward which could not be controlled because of the lack of an operable standpipe.

17. Captain Stegall testified that during the March 20, 1985 inspection, he found evidence of fires in certain rooms of the building.

18. *See* supra note 1.

there can be no reasonable doubt of its propriety, no probability that the defendant can make any valid objection to it, and no possibility that its justice can be contraverted. Unless its grounds be inexpugnable, both sides must be heard before its issuance, and even then it should be refused unless irreparable and immeasurable would result.

*Thomas v. Mississippi Power and Light Company,* 170 Miss. 811, 152 So. 269 (1934).

The defendants have raised, as a defense, objections to their being ordered to comply with the law. They argue that vandalism, caused by the failure of the Jackson Police Department to sufficiently patrol the area, prevents maintenance of an operable standpipe system.[19] The evidence simply does not support the defendants' contention that police protection is inadequate. Furthermore, the defendants have cited no authority for the proposition that the alleged lack of adequate police protection justifies maintaining a public nuisance and failure to comply with the law. The court concludes that the plaintiff has met the heightened burden of proof necessary for issuance of a mandatory injunction.

It is the opinion of this court that the injunction sought with reference to the standpipe should issue and that the other relief sought should be denied.

It is, therefore, ordered that the parties shall, within ten days of the date of this memorandum opinion and order, submit to the court an agreed schedule for installation of an operable standpipe system in the King Edward. Should the parties be unable to reach such an agreement, each party shall submit separate proposed schedules for review by the court.

A judgment shall be submitted in accordance with the local rules.

---

19. The defendants argue that if a dry system were installed and the valves stolen by vandals, inspectors would not be able to determine if the system is working without testing it. Firefighters would be in much more danger if they could only discover the system was inoperable when tried during a fire. This argument obviously does not justify a refusal to maintain an operable system.