666 So.2d 485 (1995)
Ronald BOSARGE, d/b/a The Pines Club
v.
STATE of Mississippi, ex rel. Joe PRICE, Sheriff of Harrison County, ex rel. Bob Payne, County Prosecuting Attorney for Harrison County, Mississippi.
No. 92-CA-00672-SCT.
Supreme Court of Mississippi.
November 30, 1995.
James K. Wetzel, Joy Harrison Goundas, Gulfport, for appellant.
Margaret Alfonso, Gulfport, for appellee.
Before HAWKINS, C.J., and SULLIVAN and SMITH, JJ.
SMITH, Justice, for the Court:
Ronald and Linda Bosarge co-owned and operated the Pines Club which had developed a reputation and a careless practice of serving alcohol to minors. After repeated unsuccessful attempts by law enforcement officers to control the situation, the State of Mississippi brought a bill of complaint in the Chancery Court of Harrison County to abate a *486 nuisance by requesting a permanent injunction, which the lower court granted.
Aggrieved, Bosarge appeals to this Court raising the following issues:
I. WHETHER THE PINES CLUB CONSTITUTED A NUISANCE FOR THE PURPOSES OF ISSUING AN INJUNCTION AGAINST ITS OPERATION.
II. WHETHER THE BOND WAS EXCESSIVE AND VAGUE AND OVERBROAD SO AS TO BE UNENFORCEABLE.
III. WHETHER THE TRIER ERRED IN INCLUDING CERTAIN TESTIMONY.
We find only Issue I concerning whether the Pines Club constituted a nuisance sufficient for the chancellor to issue the permanent injunction warrants discussion by the Court. Issues II and III are without merit.
When the owners of property repeatedly use the premises to violate the law, and where law enforcement is forced to repeatedly return to a scene to curb illegal usage of a property, the property can be abated as a nuisance. We hold that the Bosarges' repeatedly allowing teenagers access to alcohol, endangering their lives and the lives of other innocent motorists when these teens attempted to drive on adjacent highways after consuming alcohol at the Pines, coupled with the other numerous reported incidents of various felonies, misdemeanors and disturbances in and around the Pines, warranted the chancellor's permanent injunction against the Bosarges and their establishment. After a thorough review of all evidence, as well as the briefs and authority cited, we conclude that the chancellor's granting of a permanent injunction was not manifest error and this Court must affirm.

STATEMENT OF FACTS
Linda and Ronald Bosarge had owned and operated the Pines Club, (hereinafter the Pines), located on U.S. Highway 49 North in Gulfport, since May of 1985. The Pines served alcohol to many students attending Perkinston Junior College as well as teenagers in the local high schools. The official policy of the Pines was to allow eighteen to twenty year olds entrance to the Pines, but only allow those over age twenty-one to purchase alcohol. Unfortunately, the Pines did an extremely poor job of supervision of minors. The establishment was not careful in admitting teens under the age of eighteen, or in ensuring that those minors admitted were not allowed to purchase or drink alcohol at the Pines.
The Bosarges knew when receiving their liquor license that no minors, except minors accompanied by parents or guardians, or under proper supervision, would be permitted on the premises. Yet, the record reflects that under age patrons were able to have access to alcohol. Some nights were more crowded and busier than other nights, especially Wednesday night, known as "Perk night", so named because students from Perkinston Junior College heavily attended the Pines on that particular night. There were far more disruptions on "Perk night" at the Pines than on any other night of the week.
Complaints received by the Gulfport ABC Office initiated investigations of the Pines Club. On March 28, 1990, in order to determine whether minors were served alcoholic beverages, a minor employed by the ABC was sent in, and was able to purchase hard liquor from a Pines employee. Bosarge's permit was suspended for four weeks, three weeks for the offense and an additional one week imposed for already being on probation from a previous infraction. On January 27, 1989, the Pines sold alcoholic beverages to a minor, for which they were put on probation for a year. The ABC often accompanied the Harrison County Sheriff's Office on "walk throughs," where the officers and ABC agents would check IDs and verify the age of those who appeared to be under age and were drinking at the time. Bosarge was usually present during these visits to the Pines. Mark Smith of the ABC Division testified that he spoke to Bosarge numerous times about the complaints received and the problems apparent at the Pines. Smith testified that the Pines was frequented by minors and that the minors had unlimited access to consumption of alcoholic beverages on the premises. Smith stated that the usual practice *487 at the Pines was that someone at a table purchased a pitcher of beer, allowing anyone at that table to have free access to the beer. Smith stated that there did not appear to be any supervision of the tables once the pitcher was delivered.
The Pines was very crowded and there were problems with the parking situation because patrons parked in the median and on both sides of the highway. Wrecks occurred during all hours of the night. All of the "No Parking" signs and traffic-control devices the Highway Department had installed around the establishment were pulled up by kids. The signs were replaced about six times.
Richard Smith, a highway patrol officer, testified that he had received numerous complaints from parents and other school officials. He stated that over 90 percent of the wrecks around the Pines involved fifteen, sixteen and seventeen year old teens that had been drinking. Smith stated that there were several fatalities involving drinking and driving. He linked the teenagers at the Pines to the wrecks stating that the wrecks usually involved teenagers exiting the Pines' parking lot onto the highway. He estimated that about three to four dozen incidents occurred immediately in front of the Pines. Most of these accidents occurred on "Perk night."
Bill Haden, Harrison County Sheriff's Department, compiled an incidents report file on the Pines, containing accumulated fake IDs, altered IDs, or IDs that didn't belong to the people that had them. Haden also compiled a list of 134 criminal cases occurring at the Pines between 1986 and 1992. The list included 44 assaults, which include simple assaults and felony aggravated assaults; 16 burglaries of an auto; 7 grand larcenies; 10 malicious mischiefs involving damage upon the Pines' physical building itself; 22 disturbing the peace and/or disorderly conduct complaints; one rape; 4 firearms violations; 2 business burglaries; 3 trespassing reports; 6 petty larcenies; 3 drug violations; 6 ABC violations; 3 lost items; 1 possession of gambling paraphernalia; 2 public drunks; 2 juvenile problems; 2 destroying county property; and one arson of an auto. Fifty-three of the people, either victims or suspects, involved in these incidents were under twenty-one years old. Moreover, the problem appeared to have gotten worse over the years: whereas, the year 1986 showed a total of 4 incidents, by 1990, there were 44 incidents, and by 1991, 42 incidents.
Another "sting operation" was launched against the Pines in the summer of 1991 resulting in the arrest of five Pines bartenders. On July 24, 1991, nine minors were found in possession of alcohol. Over 100 kids were ID'ed, and over 50 were under age twenty-one. Fifteen persons were without any ID whatsoever. Haden stated that there were over 50 kids under age twenty-one present.
Sergeant Thomas Clifford, Harrison County Sheriff's Office, testified that the undercover operation lasted a period of three months, and during that time, were 10 to 12 occasions that they monitored the Club. Clifford stated that excepting two of the officers' visits, alcohol was sold to minors on every occasion. He testified that the Pines had a reputation as being the bar to go to if you were under age and wanted to drink.
Clifford also testified that he responded to several calls at the Pines, usually for malicious mischief, assaults, fights, and juvenile drinking problems. He often observed many persons who did not have their hands stamped with the number 21 which authorized them to make alcohol purchases. Clifford knew many of them were under age twenty-one, because he knew their older siblings in the community and thus was able to determine the age of these under age patrons. According to Clifford, there was minimal supervision at the Pines, usually only five bartenders employed to work a crowd of over two hundred patrons.
James Dale Johnson, Chief Investigator, Harrison County Sheriff's Department, testified that approximately fifty to seventy-five under age teenagers were at the Pines during the last night of the "sting." He recalled that the youngest teenager present was only sixteen years of age.
Johnson also alluded to another incident which had its origins at the Pines. William Elliot, a minor, had left the Pines Club after *488 drinking with his friends. Elliot made a fatal decision to hood surf on a moving vehicle. Johnson described the Pines as a "haven" for reckless teenagers. Andy Calvanese, Criminal Investigator, Harrison County Sheriff's Department, investigated the William Elliot incident. When interviewing the teenagers involved, "they stated to [him] that they had been drinking beer at the Pines Club." Calvanese had many occasions to arrest juveniles that were under the influence of intoxicants at the Pines.
Captain Randy Cook of the Harrison County Sheriff's Department, testified that the Pines did not police its patrons to insure that under age persons did not receive alcohol. His testimony was primarily based on parents' complaints when their drunken kids had returned home from the Pines.
Sarah Lizana, Community Relations Unit, Gulfport Police Department, testified that she was familiar with the Pines because school counselors and parents would call and request help with bringing their under age children home from the Pines. Lizana's eighteen year old son told her that he had been allowed into the Pines at the age of sixteen. Lizana stated that the Pines was a "detriment to society" for allowing young teenagers to be served alcohol.
George Payne, Police Officer, City of Gulfport, testified that over the years, after having worked with schools, school administrators, drug specialists, teachers, parents, PTA groups, Neighborhood Watch groups, different youth groups, he had heard a lot of references to the Pines as servers of alcohol to juveniles.
The Bosarges' case primarily focused upon how they managed their business establishment. Linda Marlene Bosarge, co-owner of the Pines Club, testified that she and her husband had tried to not violate the law, but obviously failed. In an effort to ameliorate the parking dilemma, they created a parking lot on adjacent property for their patrons. In order to control the admission of those under age eighteen, Linda said she tried to maintain two bouncers to guard the entrance door. Hand stamping was also required. The eighteen twenty year olds were stamped with a fluorescent orange or pink color, and they changed the color every so often so the minors could not duplicate the stamp. For the age twenty-one or over crowd, they put an invisible ink stamp, which only shows up under black neon lights, which were located all the way around the bar, above the tables, around the dance floor, and one at the register.
The front door personnel (basically, a man in a wheelchair) looked at the IDs carefully, and as a policy, asked for a driver's license. If the ID was questionable as belonging to the person submitting it, they asked them to take a pen and paper and write their names, so as to have a signature for comparison purposes. Linda claimed that asking persons to regurgitate the information on the driver's license was useless because most could memorize those details in a manner of minutes. She stated that if still questionable, the ID was confiscated.
Linda stated that in order to prevent minors from purchasing alcohol, it was only sold at the designated bar area. They also forbid the eighteen to twenty year olds from sitting at the bar. However, she admitted that young girls often brought miniature bottles of alcohol in to the Pines from the outside, and poured it into their fountain drinks in the bathroom. Linda regularly policed the bathroom. She admitted that there was no foolproof way devised to insure that minors did not drink. She knew that without the aid of a computer, it was going to be hard to tell whether an ID was a fake or not. She related that when teens would have their fake IDs confiscated, they would have another one reproduced and come back to the Pines a few weeks later, hoping that management might have forgotten what they looked like. She claimed that she tried to help parents who would call her to ask if their children were frequenting the joint. She kept pictures of children which were furnished by their parents for the purposes of maintaining a lookout for these children. Linda stated that once a juvenile was caught, she would call the parents of the minor to come get him or her. She also stated that she employed five people to monitor a crowd of over two hundred patrons.
*489 On cross-examination, Linda explained that since her brother-in-law, D.E. Bosarge, was convicted of contributing to the delinquency of a minor for allowing a 14 year old into the Pines, he was no longer monitoring the door, but had been moved to security and other managerial duties. She also admitted that in February 1986 her husband had been convicted of contributing to the delinquency of a minor when he had allowed a minor to come into the Pines with her family. The family bought several pitchers of beer, and this minor consumed some of the beer.
Ronald Bosarge, co-owner of the Pines Club, stated that it was his policy to make juveniles caught drinking leave the premises. His main complaint was that he was never adequately informed about the extent of the problems at his place of business and that the highway patrol should have told them about the problems at the Pines, such as the problems with parking along the highway. He stated that he did not think that he needed to make any changes about the five persons he usually had to monitor under age drinking, but would if it meant not losing his business. Mr. Bosarge acknowledged that even though the previous owner of the Pines had identical problems handling the younger crowd, Bosarge still advertised that an under age twenty-one crowd would be welcome. He noted that nobody else in Pub Magazine advertised age eighteen to enter, but that since his overhead was so large, he "need[ed] every customer [he] could get."
The chancellor issued an injunction on June 1, 1992, which closed the Pines Club because it constituted a nuisance and subjected the Bosarges to the payment of a $50,000 cash bond. This Order was modified so that the Bosarges could post a surety bond, instead of a cash bond, so long as they operated the Pines Club as a pizza parlor and game room where no alcoholic beverages were sold, and made the changes necessary to ensure that the Highway 49 right-of-way was free from the prior hazardous vehicle parking.

STANDARD OF REVIEW
This Court reviews an order for an injunction to see if the chancellor has committed manifest error or lacks substantive evidence to support his judgment. Gearheard v. McCool, 601 So.2d 876, 877 (Miss. 1992).

DISCUSSION OF LAW

WHETHER THE PINES CLUB CONSTITUTED A NUISANCE FOR THE PURPOSES OF ISSUING AN INJUNCTION AGAINST ITS OPERATION?
As a general rule, a nuisance is a wrong arising from the unreasonable, unwarrantable, or unlawful use by a person of his own property or from his own improper, indecent, or unlawful personal conduct working an obstruction or injury to a right of another or of the public producing such material annoyance, inconvenience, discomfort, or hurt that the law will presume a consequent damage. Young v. Weaver, 202 Miss. 291, 32 So.2d 202 (1947). A defense exists where there is an adequate remedy at law. Proby v. State Ex Rel. West, 498 So.2d 792 (Miss. 1986); Paramount-Richards Theatres v. City of Hattiesburg, 210 Miss. 271, 49 So.2d 574 (1951). However, a chancery court's authority to suppress a public nuisance by injunctive process is an additional remedy separate from criminal law. The mere fact that the public nuisance may also be a violation of criminal law, thus presenting an adequate remedy at law, does not reduce this authority of the chancery court to abate the public nuisance. State v. Myers, 146 So.2d 334 (Miss. 1962).
A case close on point to the case sub judice is Proby v. State Ex Rel. West, 498 So.2d 792 (Miss. 1986), which involved the appeal of a chancery court order permanently enjoining the operation of a Biloxi establishment known as the "Little Apple." The chancellor declared the Little Apple a nuisance and posted a $20,000 bond to insure compliance. There, we found no error in the chancellor's decree. Id. at 793. At the Little Apple,
various illegal and obnoxious activities continually occurred in and near the lounge. There were frequent incidents involving fights, aggravated assaults, stabbings, gambling, shootings, and other disorderly conduct. Police officers testified that they had made hundreds of visits to the Little *490 Apple over a two-year period and that on most of those visits they had observed the use of marijuana in and around the lounge. Indeed, during an undercover investigation one officer repeatedly purchased narcotics there himself... . Finally, an ABC raid in May 1983 uncovered 59 bottles of liquor, resulting in Proby's conviction for illegal possession of liquor.
Id. at 793.
In Green v. State Ex Rel. Chatham, 56 So.2d 12 (Miss. 1952), the State closed down Fred Green's Cafe in Oakland, Mississippi, because its operation constituted a nuisance. The residents and neighbors of Green's cafe/dance hall were disturbed by the loud and boisterous noises and music blaring from the establishment at all hours of the night and even on the Sabbath morning, and from the stench of urine found around the establishment's vicinity due to its lack of proper sanitary facilities. The Court found that Green "continued to operate said place to the detriment of the welfare, morals, health and well being of the citizens of Oakland and surrounding territory." Id. 56 So.2d at 13. The Court felt that the situation was "a continuing one and c[ould] not be effectively controlled unless the [establishment was] declared ... to be nuisance and abated as such." Id. The Court abated the nuisance because it "interfered with, disturbed and unreasonably intruded" upon the rights of others. Id. at 14.
The Bosarges, notwithstanding Proby and Green, argue that an adequate remedy at law exists in their situation, such as punitive delicensing measures by the ABC. The phrase their defense in terms of not being a den of narcotics activity or being so obnoxious as to bother nearby neighbors.
Like the Bosarges, Mr. Proby also sought to convince this Court that an adequate remedy at law existed so as to preclude the granting of an injunction. However, in Proby, we held that since "[t]he record show[ed] that the continual intervention of the Biloxi Police Department did not suffice to curtail the various obnoxious activities at the lounge, ... the city had little choice but to seek an injunction." Proby, 498 So.2d at 794. Where a city is powerless to stop repeated violations of the law or to secure peace, the city has the right and power to bring suit in chancery for abatement of nuisance. Paramount-Richards Theatres v. City of Hattiesburg, 210 Miss. 271, 49 So.2d 574 (1951). In Paramount-Richards, we held that
[u]nder many circumstances, injunctions will lie to prevent repeated and continuous violations of a penal statute... . The court found from all the facts that the operation of the picture shows in defiance of the [Sunday] law was a nuisance, and that the situation would grow worse unless enjoined. [Because the theater owners did not comply, 185 arrests were made during five Sundays.]
Id. at 579.
Likewise, in the case at bar, the State had little choice but to seek an injunction. Police officers and the ABC had repeatedly visited the Pines. There were various automobile accidents at that location, usually involving minors and alcohol. The Pines either deliberately or recklessly served alcohol to those under the age of twenty-one. The Pines was the site of various fights, assaults, one rape, burglaries, and juvenile problems. Traffic control devices were repeatedly installed and routinely torn down around the establishment. The Bosarges failed in curbing the obnoxious activities and sheer havoc stemming from the Pines.
Albeit legal, the Bosarges made a decision to admit those teenagers between the ages of eighteen to twenty with full knowledge that minors were required to have proper supervision. They failed miserably at maintaining supervisory control over both the minors in the ages of eighteen to twenty, and even those below the age of eighteen that managed to cross their threshold. It is arguable that Mr. Bosarge had a perverse incentive to fail since Ronald Bosarge testified that "he needed every patron he could get" in order to meet his large overhead. Only five persons worked crowds of over two hundred. The employment practice was to place two persons usually at the door, one at the bar, leaving only two to frequent and monitor the tables. Due to either their foolishness, negligence or wilful disobedience to the law, the *491 Bosarges repeatedly broke the law, and created a "haven" for reckless teenage behavior. This created an atmosphere that endangered not only their inebriated under age patrons, but also those who were involved in vehicular accidents with these youngsters. The obnoxious activities continued, and the Pines could not contain the problems. No effort was made in the years the Pines was open, and there was no reason to believe that things would improve in the future. It appeared that the situation could only have grown worse. Thus, the State was left no choice but to file for a permanent injunction, which the chancellor, according to Proby and Paramount-Richards, properly granted. Requesting the State to repeatedly arrest Pines bartenders and under age patrons is out of the question, when it was the Pines' lax standards that induced the very nuisance sought to be abated.
Furthermore, the argument that the Pines did not also have problems involving the narcotics trade, as in Proby, does not demand that the Pines receive less severe treatment. At the point of closure, narcotics was one of the few vices not occurring at the Pines. Considering the mountain of evidence about disruptions, disturbances, numerous misdemeanors and felonies, and repeated alcohol-related problems at the Pines, there was more than ample evidence on which to grant a permanent injunction against its operation.
The Bosarges next attempt to persuade this Court that the problems occurring around the Pines cannot be linked to them. In Green, Fred Green also tried to convince this Court that an adequate remedy at law existed because prosecutions could be had for offenses committed in and around his cafe, and that Green had no control over, and was not responsible for, the conduct of persons on the outside of the cafe.
This Court, in Green, answered the challenge by noting that:
the proof, however, showed that the annoyance to the public complained of was caused by the patrons of the cafe who were attracted there by the music of the juke box and by the frivolity permitted in and around the cafe, ... and that loud and boisterous conduct was indulged in by those whom appellant [Green] permitted to assemble in and around the cafe.
Green, 56 So.2d at 15.
In the same vein, this Court now answers the Bosarges, by also noting in Green that "[a] public dance hall is not a nuisance per se, but it may become a nuisance by reason of surrounding circumstances. It may become a nuisance by the manner in which it is conducted, and by the conduct of the persons assembling in and around it. Whether or not it is a nuisance is a question of fact." Id. at 16.
The proof in this case shows that teenagers as young as fifteen, sixteen, and seventeen were frequently attracted to the Pines. The Pines openly advertised that eighteen or over could enter. The Pines practice of serving a pitcher of beer to a table, and then letting patrons at that table, regardless of age, have free reign in consuming that pitcher was common knowledge to patrons, parents and law enforcement. During the summer of 1991 sting, five bartenders were arrested for serving alcohol to minors. During ten of the twelve different occasions when law enforcement checked the Pines, employees were observed serving alcohol to minors. The Pines was known as the place to go if one was under age and wanted to drink. We must agree with the chancellor. It was the frivolity and loose restrictions on alcohol that attracted these young patrons to the Pines. The Bosarges encouraged this nuisance by lax supervisory standards. Thus, it is inconsistent for the Bosarges to argue that there is no link between their operation of the Pines and the conduct of their patrons, and that an adequate remedy at law existed for the conduct of their patrons, when it was their practices which indulged young people to drink in the first place.
The Bosarges request that this Court reconsider the issuance of the injunction arguing that they should not be held responsible for accidents occurring outside of the Pines premises. Yet, most of the accidents involved teenagers whose vehicles were struck while exiting from the Pines onto the highway. *492 During the investigation of the William Elliot incident, his friends confessed that they had been at the Pines and after consuming alcohol, they decided to go "hood surfing" on vehicles while traveling upon the highway. The Bosarges cannot blind themselves to the natural progression of events that accrue from minors frequenting their establishment, consuming alcohol, and then leaving the bar to enter the world of the general public. Although these minors do have an element of self-control, and perhaps their parents should have closely monitored their activities instead of relying on bar owners to do their parenting for them, nonetheless, the Pines is linked to virtually all of the juvenile problems happening in and around the Pines premises.
Moreover, the Bosarges' attempt to distinguish Green and other nuisance cases involving the intrusion upon the rights of neighbors from this case because the Pines has no immediate neighbors surrounding its premises is rejected by this Court. In Green we looked at the following language when determining what constitutes a nuisance:
No doubt a nuisance is public if it affects the entire community or neighborhood, or any considerable number of persons. Furthermore, ... it seems to be sufficient to constitute acts or conditions a public nuisance if injury and annoyance are occasioned to such part of the public as come in contact therewith.
Green, 56 So.2d at 15.
Likewise, in the case at bar, it is not necessary to have immediate neighbors. If the nuisance affects the entire community or neighborhood or any considerable number of persons, such is sufficient. The Pines would be hard pressed to deny that an inebriated minor who drives home from the Pines is not a threat to the entire community or neighborhood or any considerable number of persons traveling upon the highways. The chancellor even noted:
This place is located upon a heavily-traveled highway, one of the main routes from the south part of the United States to the north part  you can go from Gulfport to Chicago  and it connects with the main east/west I-10.
There have been numerous accidents that have occurred at the Pines involving Pines patrons and such part of the public that came in contact with them. Injury has accrued to members of the general community due to the negligence of the Bosarges in eradicating under age drinking at the Pines. This issue is without merit.

CONCLUSION
The operation of the Pines and the activities around it constituted a nuisance and a detriment to society. The Bosarges knowingly made the decision to admit teenagers under age twenty-one into the Pines. Albeit legal, the decision was ill-advised. Ronald Bosarge testified that he needed to admit every person possible into the Pines to meet his large overhead required for operation. However, our law simply does not tolerate minors receiving alcohol in order to allow business owners the luxury of meeting their overhead. There was substantial evidence to support the chancellor's decision. There was no manifest error by the chancellor in employing equitable powers to abate a situation that grew out of control and could not be rectified by the Bosarges' inept management skills, or the repeated visits by law enforcement officers. The Bosarges' claims are meritless. This Court must affirm the decision of the chancellor who granted the State's requested permanent injunction closing the Pines because of the nuisance created by its operation and surrounding activities of intoxicated teenagers.
JUDGMENT AFFIRMED.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and SULLIVAN, PITTMAN, BANKS, McRAE and JAMES L. ROBERTS, Jr., JJ., concur.