# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-01219-COA

LOWRY YARBROUGH                                                                 APPELLANT

v.

SACRED HEART CATHOLIC SCHOOL OF                              APPELLEES
HATTIESBURG, MISSISSIPPI AND KARYN
CHARLES, IN HER CAPACITY AS PRINCIPAL
OF SACRED HEART CATHOLIC SCHOOL OF
HATTIESBURG, MISSISSIPPI

| | |
|---|---|
| DATE OF JUDGMENT: | 10/25/2023 |
| TRIAL JUDGE: | HON. SHEILA HAVARD SMALLWOOD |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | DANIEL MYERS WAIDE |
| ATTORNEYS FOR APPELLEES: | CHRISTIAN STRICKLAND |
| | ROBERT THOMAS SCHWARTZ |
| | CARLEE VICTORIA DYMOND |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 01/14/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., LAWRENCE AND EMFINGER, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     Sacred Heart Catholic School of Hattiesburg, Mississippi, and Karyn Charles, in her capacity as principal of the school (collectively "Sacred Heart") filed a petition in the Chancery Court of Forrest County, Mississippi, seeking a restraining order and injunctive relief against Lowry Yarbrough, a former employee and contract worker at the school whose children had also attended Sacred Heart. The petition seeking injunctive relief concerned certain threats and actions taken by Yarbrough against Charles and Sacred Heart.

¶2.     In particular, on June 9, 2023, Yarbrough sent flowers with a threatening note to

Charles at the school's address. The note read, "Matthew 18 May gods [(sic)] wrath be just [and] swift for the pain you have caused to that family. SEC. 97-37-17." "SEC 97-37-17" is a reference to Mississippi Code Annotated section 97-37-17 (Rev. 2020), which is entitled, "Weapons possession on educational property" and prohibits "any person" from "possess[ing] or carry[ing], whether openly or concealed," a "weapon" on "educational property," as more particularly defined by the statute. Other disturbing incidents had taken place between Yarbrough and school authorities prior to this incident.

¶3. The chancery court granted a preliminary injunction and, ultimately, a permanent injunction restraining Yarbrough from contacting Charles and from coming within 100 yards of Charles and certain specified Sacred Heart properties. Yarbrough appeals, asserting that the chancery court erred because (1) Sacred Heart's petition for injunctive relief was not based on an underlying cause of action; and (2) the facts of this case show that Yarbrough was not an actual threat to the parties.

¶4. Upon review, we find that Sacred Heart stated a legally cognizable claim for injunctive relief grounded in Sacred Heart's right to protect its students and employees from the foreseeable risk of harm posed by Yarbrough's conduct. We find no abuse of discretion in the chancellor's rulings granting temporary and permanent injunctive relief in this case. Accordingly, we affirm.

## COURSE OF PROCEEDINGS AND STATEMENT OF FACTS

¶5. On June 12, 2023, Sacred Heart filed a sworn petition for a temporary and permanent restraining order, combined with an emergency petition for ex parte relief, against Yarbrough

2

after Charles received "a threatening note that came with flowers from a local Hattiesburg florist, University Florist," on June 9, 2023. The petition alleged that Yarbrough was the person who sent the flowers. An affidavit of the florist who received the order, Ashley Kent, was attached to the petition. In her affidavit, Kent identified Yarbrough as the person who ordered the flowers and wrote the accompanying note on June 9.

¶6. Also attached as exhibits to the petition were copies of the address card and the note accompanying the flowers. The address card was addressed to Charles at the school's address. The hand-written note accompanying the flowers read, "Matthew 18 May gods [sic] wrath be just [and] swift for the pain you have caused to that family. SEC. 97-37-17." As noted, "SEC 97-37-17" is a reference to the Mississippi statute prohibiting the "possess[ion] or carry[ing]" of weapons on "educational property" under certain conditions as set forth in the statute. Miss. Code Ann. § 97-37-17.

¶7. In its petition, Sacred Heart alleged that Yarbrough "has caused [Sacred Heart] to be in fear of harm to person and property." In particular, Sacred Heart alleged that it was "in fear for the safety of school and church administration, faculty, students, and staff, as well as the families of these individuals" and that there existed "a threat of irreparable harm to [Sacred Heart] if the . . . relief [requested] in this Petition is not granted." Sacred Heart sought a temporary and permanent restraining order to prevent Yarbrough from coming near Charles and from coming on or near specified Sacred Heart properties. Because Sacred Heart also sought an emergency ex parte temporary restraining order, the petition included the certification from Sacred Heart's attorney required pursuant to Mississippi Rule of Civil

3

Procedure 65(b).[1]

¶8. On that same day, the chancellor signed an order for ex parte relief that prevented Yarbrough from coming within three hundred feet of Sacred Heart, its employees, including Charles, as well as Sacred Heart's "employees' homes, . . . place of work, and/or schools," which included certain Sacred Heart properties specified in the temporary restraining order. The chancellor also set a hearing for the matter on June 21, 2023. Yarbrough was personally served with the summons and petition on June 13, 2023. He appeared with counsel at the June 21, 2023 hearing.

¶9. At the hearing, Yarbrough's counsel moved the court to dismiss the petition and vacate the TRO, arguing that the court cannot grant an injunction if the petitioner did not also allege an underlying claim, and Sacred Heart failed to do so.

¶10. In response, Sacred Heart's counsel asserted that the chancery court had jurisdiction over equitable matters, including injunctive relief. Counsel emphasized that "[t]his case relates to a threat made to a principal of a school," and the school must have the ability to "protect [its] children" and ensure "that someone doesn't come and carry through with a

---

[1] Mississippi Rule of Civil Procedure 65(b) provides as follows:

A temporary restraining order may be granted, without notice to the adverse party or his attorney if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss or damage will result to the applicant before the adverse party or his attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and reasons supporting his claim that notice should not be required.

M.R.C.P. 65(b).

threat on [the] school." Counsel emphasized that "[t]he school has to take these . . . threats very seriously."

¶11.  Specifically with respect to the circumstances in this case, counsel noted:

> In this case we have a cryptic threat, as the record shows and will show, of a card being sent to a principal with flowers containing a cryptic threat which asked that God's wrath be upon the principal, and then it includes a citation to the Mississippi Code provision dealing with firearms on school property. This is very troubling, and it's also troubling in conjunction with the other and prior conduct of the Defendant who made troubling statements to the school before.

¶12.  After taking a recess to review the motion and the parties' arguments, the chancellor denied Yarbrough's motion to dismiss and vacate the temporary restraining order.

¶13.  The chancellor then instructed the parties to proceed with the hearing. Witnesses who testified at the hearing included Charles; Kent (the florist); Father Kenneth Ramon-Landry, the pastor affiliated with Sacred Heart School; and defendant Yarbrough.[2]

¶14.  Charles testified that she had been the principal of Sacred Heart for approximately one year, and before that she had been a teacher at the school for six years. Sacred Heart had previously employed Yarbrough as the physical plant director and also contracted with him to oversee the maintenance of the sports fields. Yarbrough's employment and the maintenance contract with the school ended in February 2023. His children attended school at Sacred Heart.

¶15.  On June 9, 2023, Charles was working at the school when a bouquet of flowers

---

[2] Yarbrough's wife, Jenny Yarbrough, also briefly testified about an incident where she was talking to Charles at a soccer game. Charles had asked Jenny about her father's health. Jenny testified that at that point, Yarbrough walked up, "put his arm around [her (Jenny),]" and said, "Do not talk to her."

accompanied by the above-described note invoking "gods [(sic)] wrath" upon Charles and referencing section 97-37-17, as noted, was delivered. Charles testified that she was "terrified" when she received the note; she feared for herself, "the students, employees, faculty and staff, . . . and [her] own personal family as well." She said she was especially fearful because of all the school shootings that have been happening.

¶16. In this context, Charles recognized that one of her duties was to protect the students at the school. She explained that as the school principal, "when I receive a threat, I have to do what's best to secure the building for my students, faculty and staff." Charles testified that the contents of the note "were very disturbing." She still felt threatened by Yarbrough and felt that he remained a threat to both her and to Sacred Heart.

¶17. Charles believed that the note accompanying the flowers was from Yarbrough because of the circumstances surrounding his termination, including a prior threat he had made to her and another administrator in a meeting after Yarbrough's employment was terminated, and other threatening language that Yarbrough left on the school superintendent's voicemail. These incidents are addressed in further detail below.

¶18. After receiving the flowers, Charles immediately called Father Ramon-Landry to notify him of what she believed to be a threat to her. Father Ramon-Landry testified that after Charles read the note to him, he instructed Charles to call the police, and she did so. The police came to the school and took a report and some photographs.[3] Charles testified that the

_____

[3] The record contains no other information about the criminal charges except that at oral argument, Yarbrough's counsel said that the criminal case was eventually passed to the file.

6

police told her to also file criminal charges, which she did the same day. Like Charles, Father Ramon-Landry also recognized that it is his role and duty to protect the children at the school and that the school must take all threats seriously.

¶19. Kent, the florist at University Florist working on June 9, 2023, testified that Yarbrough sent the flowers and the note. Yarbrough purchased the flowers in person from University Florist. Although Yarbrough gave the store manager the name "James Smith,"[4] he gave her his own phone number. Kent testified that Yarbrough chose an arrangement of fresh flowers from the cooler, wrote the note, and asked that the arrangement be delivered to Charles at Sacred Heart.

¶20. Yarbrough claimed he intended to send the card and flowers to notify Charles that he forgave her. He said that in Matthew, Chapter 18, Jesus taught about forgiveness and letting God handle the rest. He claimed he wrote "SEC. 97-37-17" on the card as a reference to an incident with James Smith.[5] He did not offer an explanation as to what he meant by "gods [(sic)] wrath" to be on Charles. Yarbrough only stated that he hoped it would be "just and swift." Yarbrough also clarified that his reference to "that family" meant "[his] Sacred Heart family."

---

[4] James Smith is another Sacred Heart employee.

[5] During Yarbrough's testimony, exhibit 3 was admitted into evidence. Exhibit 3 is an image of Smith on the Sacred Heart campus holding what appeared to be a firearm during a traditional senior prank. Yarbrough testified that he had received the image from a school parent. He said that he wrote "SEC. 97-37-17" on the note accompanying the flowers "to bring reference to the picture that I had just been given that was circulating." Charles testified that Smith did not have an actual firearm, and Father Ramon-Landry testified that it was actually a "paint gun."

¶21. Regarding prior incidents involving Yarbrough, Charles testified that "Yarbrough was in conflict with his being dismissed as an employee"; he told her and another school administrator in a meeting with him that "it's about to get ugly." Charles testified that she asked Yarbrough if he intended that statement to be a threat, "and he just said, 'It's about to get ugly.'" Following this incident, Charles called the police when Yarbrough told Charles that he planned to come back to the school to get "paperwork." According to Charles, no one had any paperwork for him. When the police arrived, they escorted Yarbrough from the school property "and told him that . . . he had no reason to be there unless it dealt with his children [and] that he was not to come back to the school." Charles testified that during this incident, "We felt fearful; the staff felt fearful; . . . that was why we called the police at that time."

¶22. During his testimony about this interaction, Yarbrough claimed that his statement referred to suing Sacred Heart for breach of contract or monies owed. He hoped to work it out with the school without going to court.

¶23. On another occasion, less than a month before the flowers incident, Yarbrough called and left a voicemail for the superintendent of Catholic schools at the diocese office in Biloxi. A transcript and an audio file of the May 18 voicemail were admitted into evidence. The message read, in part, "Sacred Heart has crossed the line this time, and they have met their match. I'm done." This voicemail followed an episode involving one of Yarbrough's children. Yarbrough and his wife had transferred their children to another private school in the area, and they believed that Sacred Heart did not give a good reference for the children.

Charles testified that the school did give the children a good reference. She said that after this incident, she felt "nervous and scared" and testified that it had just been "one thing after another."

¶24. At the end of the hearing, the chancellor took the matter under advisement. The chancellor also signed an order on June 23 extending the temporary restraining order pending issuance of a ruling on Sacred Heart's request for a preliminary injunction. This order also added the clarification "that the prior restraining order does not affect . . . Yarbrough's right to travel on public roads near the properties covered under the restraining order."

¶25. On June 26, "after [having] considered testimony and documentary evidence admitted at trial and having observed the appearance and demeanor of the parties and their witnesses," the chancellor granted Sacred Heart's request for a preliminary injunction.

¶26. The chancellor also addressed Yarbrough's motion to vacate the restraining order in which he sought to dismiss Sacred Heart's petition "because it fails to state a claim beyond injunctive relief." In denying Yarbrough's petition, the chancellor distinguished *Short v. Williams*, 303 So. 3d 87 (Miss. Ct. App. 2020), a case Yarbrough relied upon in support of his argument. The chancellor noted that in *Short*, "the appellate court . . . upheld the dismissal of a zoning case because zoning enforcement is a discretionary function[,] not mandatory[,] [and] thus there was no viable claim to enforce. *Short v. Williams*, [303 So. 3d] at [103] [(¶40)]." Continuing, the chancellor then found:

> By contrast, Sacred Heart seeks to prevent the violation of a substantive "legal right"—the right and legal duty to protect its students and employees from the threat of harm. *Waite v. Adkisson*, 282 So. 3d 744, 750 [(¶17)] (Miss. Ct. App. 2002). Schools have the responsibility to use ordinary care and to take

9

reasonable steps to minimize foreseeable risks to students by providing a safe school environment. *Summers v. St. Andrew's Episcopal Sch.*[] *Inc*., 759 So. 2d 1203[, 1213 (¶40)] (Miss. 2000). . . . The bottom line is that Sacred Heart has a legal duty and substantive right to protect its students, staff[,] and administrators and is thus entitled to seek the injunctive relief requested under Rule 65 of the MRCP.

¶27. The chancellor then examined and set forth her findings on each of the four factors the court must assess in determining whether the issuance of a preliminary injunction is warranted. We address these findings below.

¶28. Sacred Heart moved for a permanent injunction on July 31. The chancellor held a hearing on the motion on August 31. At the hearing, Yarbrough renewed his motion to dismiss. Neither side made new arguments. The parties submitted caselaw for and against Yarbrough's renewed motion to dismiss. No new evidence was presented at the hearing, other than the fact that Yarbrough and his family had moved to Meridian, Mississippi. On that point, Sacred Heart's counsel noted that this new development "would go to the element regarding whether any harm an injunction would cause to the Defendant." The chancellor denied the renewed motion to dismiss the petition and issued an order granting the permanent injunction on October 25, 2023. We address the chancellor's findings in that order below.

¶29. Yarbrough appealed "from the Order Denying Motion to Dismiss, Order Granting [P]reliminary Injunction [12] and Order Granting Permanent Injunction [19][,] which was entered on October 25, 2023."

## STANDARD OF REVIEW

¶30. "This Court will not disturb a chancellor's findings of fact unless the findings were manifestly wrong or clearly erroneous or unless the chancellor applied an erroneous legal

10

standard." *Lauderdale v. DeSoto Cnty. ex rel. Bd. of Supervisors*, 196 So. 3d 1091, 1099 (¶29) (Miss. Ct. App. 2016). "Where the record contains substantial evidence to support the chancellor's findings, we will not reverse her decision." *Id.* "The standard of review for the chancellor's decision is abuse of discretion." *Pratt v. Nelson*, 170 So. 3d 620, 623 (¶11) (Miss. Ct. App. 2015). Questions of law, however, "are reviewed de novo." *Cummins v. Goolsby*, 255 So. 3d 1257, 1258 (¶8) (Miss. 2018). "As part of this de novo review, this Court may affirm the chancellor's judgment if the right result was reached, even if the chancellor reached the result for the wrong reason." *Id.* at 1258-59 (¶8).

**DISCUSSION**

### I.      Issuance of the Injunction Pursuant to M.R.C.P. 65

¶31.    Yarbrough asserted and the dissent concludes that the chancery court erred in granting injunctive relief in this case because Sacred Heart did not assert a legally cognizable claim upon which injunctive relief may be granted. We disagree. As detailed below, we find that Sacred Heart asserted a legally cognizable claim based upon its legal right to take the precautions necessary to fulfill its duty to "minimize foreseeable risks" to protect its students and employees. *See Summers v. St. Andrew's Episcopal Sch. Inc.*, 759 So. 2d 1203, 1213 (¶40) (Miss. 2000); *Green v. Allendale Planting Co.*, 954 So. 2d 1032, 1037 (¶12) (Miss. 2007). We also find substantial evidence in the record that Yarbrough's conduct "infringed [upon]" and "violated" that right and that injunctive relief was an appropriate remedy.

¶32.    Like Yarbrough and the dissent, we recognize that "a permanent restraining order cannot be issued based solely on the authority of Rule 65, which is a rule of procedure."

11

*Waite v. Adkisson*, 282 So. 3d 744, 750 (¶17) (Miss. Ct. App. 2019). Rather, in determining whether to grant permanent injunctive relief, the court may only do so "to protect and prevent the violation of some substantive legal right." *Id.* (internal quotation marks omitted). As such, "[*a*] *permanent 'injunction is a remedy potentially available only after a plaintiff can make a showing that some independent legal right is being infringed*—if the plaintiff's rights have not been violated, he is not entitled to any relief, injunctive or otherwise.'" *Shannon v. Shannon*, 357 So. 3d 1043, 1055-56 (¶30) (Miss. Ct. App. 2022)[6] (quoting *Waite*, 282 So. 3d at 750 (¶17)); *see also S. Bus Lines v. Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emp. of Am.*, 205 Miss. 354, 377, 38 So. 2d 765, 770 (1949) ("No one should doubt that the State of Mississippi, through its courts by the injunctive process, can protect persons and properties in this state from damage by violence and from fear through threats and intimidation."). Thus, where a plaintiff fails to assert a "legally cognizable injury upon which . . . [injunctive] relief . . . may be granted," then injunctive relief will not be a remedy. *Tallahatchie Valley Elec. Power Ass'n v. Miss. Propane Gas Ass'n Inc*. (*MPGA*), 812 So. 2d 912, 927 (¶49) (Miss. 2002).

¶33. We briefly discuss two cases in which the plaintiff failed to assert a legally cognizable claim to illustrate the direct contrast to the circumstances before us. In *MPGA*, for example, the Mississippi Supreme Court reversed a judgment granting a permanent injunction where the MPGA members had "no legal right to be free of the lawful competition posed by DeSoto

---

[6] The supreme court granted certiorari on August 29, 2022, but subsequently dismissed the writ of certiorari on its own motion on March 7, 2023. Order, *Shannon v Shannon*, No. 2020-CT-00847-SCT (Miss. Mar. 7, 2023).

Gas." *Id.* Accordingly, the supreme court found that MPGA had failed to assert a "legally cognizable injury upon which the [injunctive] relief [the MPGA] sought may be granted." *Id.* at 927 (¶49).

¶34. As another example, in *Short v. Williams*, which Yarbrough cites, the plaintiffs brought an action seeking injunctive relief against the Bolivar County Board of Supervisors, seeking to force the board to act on its languishing lawsuit against a business owner to enjoin him from operating a "juke joint in violation of [certain] zoning [regulations]." *Short*, 303 So. 3d at 90 (¶1). This Court affirmed the circuit court's order dismissing the lawsuit. *Id.* at 105 (¶46). We determined that the plaintiffs failed to plead a viable cause of action against the board because "zoning enforcement is a discretionary duty," rather than a "ministerial duty," thus entitling the board to discretionary-function immunity. *Id.* Because the plaintiffs failed to articulate a viable cause of action, their lawsuit, including their request for an injunction, was properly dismissed. *Id.*

¶35. In the case before us, however, we find that Sacred Heart asserted a legally cognizable claim based upon its legal right to take the precautions necessary to fulfill its "responsibility to use ordinary care and to take reasonable steps to minimize foreseeable risks to students thereby providing a safe school environment." *Summers*, 759 So. 2d at 1213 (¶40). As the supreme court specifically recognized in *Summers*, "the standard of ordinary care is equally applicable to [a private school] under well-established common law principles of negligence." *Id.* Sacred Heart likewise has the legal right to use reasonable means to fulfill the duty it "owes its employees . . . to provide [them] with a safe place to work." *Green*, 954

13

So. 2d at 1037 (¶12). In short, Sacred Heart has the "substantive legal right" to fulfill its responsibilities to its students and employees by taking "reasonable steps to minimize foreseeable risks" to protect them from the threat of harm.

¶36. The dissent acknowledges that the incidents involving Yarbrough as described in Sacred Heart's petition and at the hearing "were cause for legitimate concern" but then asserts that "none of them constituted a trespass or an assault or gave rise to any 'cognizable claim or cause of action against [Yarbrough].'" Dis. Op. at ¶68 (emphasis omitted) (quoting *Miss. High Sch. Activities Ass'n Inc. v. Hattiesburg High Sch.*, 178 So. 3d 1208, 1213 (¶21) (Miss. 2015)). According to the dissent, in determining that Sacred Heart asserted a legally cognizable claim in this case, the majority relies "only [on] Sacred Heart's *duties* to its students and employees" that "do not give rise to any cognizable . . . claims . . . against Yarbrough." Dis. Op. at n.12.

¶37. With respect, we disagree with the dissent's characterization of the legally cognizable right raised by Sacred Heart here. We find that Sacred Heart asserted a legally cognizable claim based upon its *legal right* to take the precautions necessary to *fulfill* its duty to "minimize foreseeable risks" to protect its students and employees.[7]

¶38. In reaching this conclusion, we bear in mind and abide by the "well-established

---

[7] The dissent also states that even if Sacred Heart had stated a legal claim against Yarbrough, "Sacred Heart has not shown that Yarbrough *has* interfered with Sacred Heart's duties to students or employees[,]" so it still would not be entitled to injunctive relief. Dis. Op. at n.12. We likewise disagree with this assertion. As we address in more detail below, we find that substantial evidence supports the chancellor's findings that Yarbrough's conduct violated Sacred Heart's legal substantive right to protect its students and employees, and injunctive relief was the proper remedy.

principle [that] . . . equity will not suffer a wrong without a remedy." *Ainsworth v. Plunk*,

343 So. 3d 1108, 1116 (¶34) (Miss. Ct. App. 2022) (citations omitted). "[This] maxim

simply means this: It is not necessary that some exact precedent be found for extending relief

in each situation." James W. Shelton, *Mississippi Chancery Practice* § 2:20 (2024-2025 ed.).

Rather, "[i]f . . . under the established principles of the law . . . some relief is clearly requisite

and a practical remedy may be applied, such remedy is not to be denied because that remedy

has never been applied in just that manner to that exact state of case." *Id.* Thus, while we

find no "exact precedent" extending relief under the precise situation before us, we find that

Sacred Heart's legal duty to protect its students and employees from the foreseeable risks

posed by Yarbrough's conduct necessarily encompasses Sacred Heart's *legal right* to fulfill

that duty and seek injunctive relief to do so.[8]

¶39.    Upon review, we find that Sacred Heart delineated a cognizable legal claim in its

petition based upon this legal right and Yarbrough's conduct allegedly violating that right.

In its petition, Sacred Heart described the flowers and threatening note sent to Charles at the

school and attached copies of the note and the address card to its petition. As alleged in the

petition, "[t]he note contained a cryptic threat which stated that God's 'wrath' would be upon

Karyn Charles and included a citation to the Mississippi Code [section that] . . . relates to

firearms on school property." Also attached to the petition was the florist's affidavit

---

[8] Indeed, we find that this equitable maxim is particularly relevant here. Although Sacred Heart also filed criminal charges, that independent criminal cause of action was legally in the hands of a third party—and the charges were not pursued by the prosecuting authorities. As such, equitable relief before the chancery court appears to have been Sacred Heart's only option for asserting its legal right to fulfill its duty to protect its students and employees from the foreseeable risks created by Yarbrough's conduct.

15

confirming that Yarbrough purchased the flowers, wrote the note, and had both sent to "Karen [sic] Charles" at "Sacred Heart High" in Hattiesburg. Receiving the note allegedly "greatly alarmed" Charles, and Yarbrough, as the sender of the note, "caused [Sacred Heart] and [its] employees to be in fear of harm to person and property." As further alleged in the petition, Yarbough's threats put Sacred Heart "in fear for the safety of school and church administration, faculty, students, and staff, as well as the families of these individuals," and there existed "a threat of irreparable harm to [Sacred Heart] if the . . . relief [requested] in this Petition is not granted."

¶40. Sacred Heart also specified the relief it sought in its petition—namely, an injunction to prevent the harm insinuated by Yarbrough's veiled threats. Relief from "harassment and intimidation" are grounds for which injunctions "are routinely issued." *Favre v. Jourdan River Ests.*, 148 So. 3d 361, 371 (¶33) (Miss. 2014); *accord S. Bus Lines*, 205 Miss. at 374, 38 So. 2d at 768 (enjoining an illegal conspiracy to commit violence, including the threats and intimidation employed to prevent employees from crossing picket lines, the supreme court recognized that "[i]t is not necessary that there should have been actual violence or physical assaults, but it is sufficient if threats, abusive language, or other acts amounting to intimidation" were employed).

¶41. Yarbrough asserts that Sacred Heart has made no cognizable claim because *he* does not know the elements of the claim against him or the applicable burden of proof. We are not persuaded by Yarbrough's assertions. Rather, we find that the allegations of the petition plainly describe conduct on Yarbrough's part that violates Sacred Heart's legal right to

16

provide a safe environment for its employees and students and protect those persons from foreseeable risks of harm. Sacred Heart stated a cognizable claim against Yarbrough for his alleged violation of this right. Further, as we have discussed above, Sacred Heart's request for injunctive relief is proper to prevent Yarbrough from carrying out these threats.

¶42. In terms of the elements of this claim, Sacred Heart was required to prove (1) it has a "substantive legal right" to protect its students and employees from foreseeable harm; (2) Yarbrough's conduct has "infringed [upon] [and] violated" that right; and (3) injunctive relief is an appropriate remedy. The petition encompasses these elements.

¶43. Accordingly, we reject Yarbrough's assertion that Sacred Heart did not assert a "cognizable claim" in its petition for injunctive relief. "Mississippi is a 'notice pleadings' state.'" *Herbert v. Herbert*, 374 So. 3d 562, 574 (¶32) (Miss. Ct. App. 2023) (quoting *City of Meridian v. $104,960.00 U.S. Currency*, 231 So. 3d 972, 974-75 (¶9) (Miss. 2017)), *cert. dismissed*, 375 So. 3d 671 (Miss. 2023). All that is required at the pleading stage is "a short and plain statement of the claim showing that the pleader is entitled to relief, and . . . a demand for judgment for the relief to which he deems himself entitled." M.R.C.P. 8.

¶44. As for the applicable burden of proof, generally speaking, "[t]he plaintiff has the duty in a tort case to prove by a preponderance of the evidence that the party charged with the tort is the one actually responsible for it." *Anglado v. Leaf River Forest Prods. Inc.*, 716 So. 2d 543, 548 (¶19) (Miss. 1998). With respect to whether injunctive relief is appropriate, "the factors . . . warrant[ing] an injunction must be established by a preponderance of the evidence." *Lauderdale*, 196 So. 3d at 1099 (¶30). We find no basis for finding that these

17

general standards would not apply to Sacred Heart's claim in this case.

¶45.  Yarbrough also asserts that the chancery court lacked jurisdiction over this matter because it was with "the purview of the criminal court." Yarbrough's argument is misplaced. Addressing a similar argument in *Southern Bus Lines*, the supreme court explained that "[t]he fact that [the defendants'] . . . unlawful acts are violations of the criminal law makes no difference. . . . [Al]though equitable action is never predicated on the prevention of crime, as such, it is also true that the fact that the conduct is punishable criminally does not constitute an adequate remedy so as to bar equitable relief." *S. Bus Lines Inc.*, 205 Miss. at 374-75, 38 So. 2d at 769; *see also Bosarge v. State ex rel. Price*, 666 So. 2d 485, 489 (Miss. 1995) (recognizing that "a chancery court's authority to suppress a public nuisance by injunctive process is an additional remedy separate from criminal law" and that "[t]he mere fact that the public nuisance may also be a violation of criminal law, thus presenting an adequate remedy at law, does not reduce this authority of the chancery court to abate the public nuisance"); *Paramount-Richards Theatres v. City of Hattiesburg*, 210 Miss. 271, 281, 49 So. 2d 574, 579 (1950).

## II.    Issuance of the Injunction

¶46.  Yarbrough asserts that the chancellor erred in issuing an injunction against him because, according to Yarbrough, Sacred Heart did not show that he was a threat to Sacred Heart or Charles. We find Yarbrough's assertions unpersuasive, particularly in light of the limited standard of review applicable in this case. Specifically, "[t]he resolution of disputed questions of fact is a matter entrusted to the sound discretion of the chancellor. On appeal,

18

we are limited to searching for an abuse of that discretion; otherwise, our duty is to affirm the chancellor." *Heidkamper v. Odom*, 880 So. 2d 362, 365 (¶10) (Miss. Ct. App. 2004).

¶47. In this regard, "[o]ur job is not to reweigh the evidence to see if, confronted with the same conflicting evidence, we might decide the case differently." *Id.* Instead, it is "[t]he chancellor, by [her] presence in the courtroom, [who] is best equipped to listen to the witnesses, observe their demeanor, and determine the credibility of the witnesses and what weight ought to be ascribed to the evidence given by those witnesses." *Id.* Thus, "[i]t is necessarily the case that, when conflicting testimony on the same issue is presented, the chancellor sitting as trier of fact must determine which version he finds more credible." *Id.* In accordance with these principles, we find no abuse of discretion in the chancellor's grant of a preliminary and a permanent injunction in this case.

### A. The Preliminary Injunction

¶48. Pursuant to Mississippi Rule of Civil Procedure 65, to obtain a preliminary injunction, Sacred Heart was required to demonstrate by a preponderance of the evidence that "1) there exists a substantial likelihood that [it] will prevail on the merits; 2) the injunction is necessary to prevent irreparable harm; 3) the threatened injury to [Sacred Heart] outweighs the harm an injunction might do to the [opposite party]; and 4) granting a preliminary injunction is consistent with the public interest." *Littleton v. McAdams*, 60 So. 3d 169, 171 (¶10) (Miss. 2011); *see Lauderdale*, 196 So. 3d at 1099 (¶30). Additionally, "[a] court is required only to 'balance the . . . factors[,]' not to resolve all four factors in one party's favor or the other, to achieve equity and grant an injunction." *Sec'y of State v. Gunn*, 75 So. 3d 1015, 1021

19

(¶19) (Miss. 2011) (citing *A-1 Pallet Co. v. City of Jackson*, 40 So. 3d 563, 568-69 (¶¶19-20) (Miss. 2010)). For the reasons addressed below, we find no abuse of discretion in the chancellor finding that a preliminary injunction was warranted in this case.

### 1. Whether a substantial likelihood of prevailing on the merits existed.

¶49. Before addressing this factor, the chancellor articulated her basis for denying Yarbrough's motion to dismiss Sacred Heart's petition for failure to state a claim upon which injunctive relief can be granted. As we have described above, the chancellor determined that Sacred Heart had stated a viable claim based upon its "'legal right' . . . to protect its students and employees from the threat of harm . . . [and was] thus entitled to seek the injunctive relief requested under Rule 65 of the [Mississippi Rules of Civil Procedure]."

¶50. Having articulated the violation of a legal right upon which Sacred Heart's request for injunctive relief was based, the chancellor then detailed her findings with respect to the substantial-likelihood-of-prevailing-on-the-merits factor, as follows:

> Charles . . . testified about three incidents concerning Yarbrough.
>
> First, Yarbrough was terminated as an employee of the school for failure to comply with administrative requests involving his duties as a maintenance worker at the athletic complex. He became angry in a subsequent meeting with . . . Charles and [another school administrator]. After he [(Yarbrough)] made threatening statements, including "it's about to be ugly," law enforcement was called to escort him from Sacred Heart property.
>
> Second, [(Yarbrough)] left a voicemail at the administrative level of the Catholic diocese on May 18th claiming that "Sacred Heart had crossed the line and they had met their match" and "that he was done." The voicemail was made an exhibit to the testimony.
>
> The third and most troubling incident involved the sending of flowers to . . .

20

Charles . . . with a message that read: "Matthew 18, May [G]od['s] wrath be just & swift for the pain you have caused to that family. Sec. 97-37-17."[9] A copy of the card was admitted as Trial Exhibit 1. The card was not signed by Yarbrough but he admitted through his testimony that he sent the card along with the flowers to . . . Charles.

Ashley Kent was the store manager at University Florist where the flowers were purchased. She identified Yarbrough as the person who bought the flowers but indicated that Yarbrough identified himself as "James Smith."

¶51. After describing the three incidents concerning Yarbrough, the chancellor specifically found that "[u]pon receipt of the card and flowers, . . . Charles testified that she felt 'threatened,' 'terrified,' and 'fearful' for herself, her family, students, faculty and staff." Additionally, the chancellor noted that "Father Ken Landry testified that he directed . . . Charles to 'do what is necessary to protect the school and the children.'"

¶52. The chancellor also addressed Yarbrough's testimony concerning his actions, observing that

Yarbrough testified that he never intended physical harm and the reference to Matthew 18 was his way of expressing forgiveness and a manner to say goodbye. He testified that the code section referring to guns in school was his reference to another employee (James Smith) holding a paint gun during a senior prank night at the school. Yarbrough felt this conduct should have been handled with disciplinary action.

Finding that Yarbrough's explanations for his conduct were "not credible," the chancellor observed: "The glaring contradiction here is not only did Yarbrough not sign the card that accompanied the flowers, he claimed another's identity at the florist. Thus, his justifications for the cryptic message on the card is not credible."

---

[9] The chancellor noted in the order that section 97-37-17 addresses the law on possessing a weapon on educational property.

21

¶53. Based upon these findings, the chancellor found that "Sacred Heart has a likelihood to prevail on the merits of whether permanent injunctive relief should be awarded."

### 2. Whether a preliminary injunction is necessary to prevent irreparable harm to Sacred Heart.

¶54. On this factor, the chancellor found that "[t]he totality of the conduct of Yarbrough on the three described incidents above creates a credible threat. Putting in place a preliminary injunction prevents irreparable harm to Sacred Heart School, students, faculty and staff."

### 3. Whether the threatened harm to Sacred Heart outweighs the harm to Yarbrough.

¶55. The chancellor found that this factor weighed in Sacred Heart's favor. In weighing the threatened harm to Sacred Heart against potential harm to Yarbrough, the chancellor found that "Yarbrough testified that his children no longer attend Sacred Heart School." The chancellor also noted that Yarbrough "testified that his work was affected by the temporary restraining order." On this point, however, the chancellor specifically stated that "the Court has clarified that the restraining order does not affect [Yarbrough's] ability to travel the public roadways so [neither] his business nor personal travel will be affected by the grant of a preliminary injunction."

### 4. Whether granting a preliminary injunction is consistent with the public interest.

¶56. With respect to this factor, the chancellor found that granting a preliminary injunction was "consistent with the public interest." *Littleton*, 60 So. 3d at 171 (¶10). Specifically, the chancellor observed that "[p]rotection against threats to school officials, particularly here

22

with references to weapons, must be afforded a higher level of protection. Violence against schools has spiked nationwide making any threat against the sanctity of the educational environment subject to heightened levels of protection." Regarding the specific situation at hand, "references to weapons on school campuses and vengeful language suggesting that God's wrath be just and swift must be met with immediate injunctive relief under the equitable powers of the Court." As such, the chancellor concluded that "[t]he grant of a preliminary injunction aligns with the public interest."

¶57. Upon review, we find substantial credible evidence in the record supporting the chancellor's findings and grant of the preliminary injunction. We therefore find no abuse of discretion resulting from the chancellor's granting a preliminary injunction in this case.

### B. The Permanent Injunction

¶58. With respect to a permanent injunction, although "the requirements for permanent injunctive relief are substantially the same as a preliminary injunction, there is one exception." *T.M.T. LLC v. Midtown Mkt. Wine & Spirits LLC*, 310 So. 3d 1217, 1228 (¶38) (Miss. Ct. App. 2021) (quoting *Winter v. Nat. Res. Def. Council Inc.*, 555 U.S. 7, 32 (2008)). Specifically, "[i]n order to receive a permanent injunction, the plaintiff must prove 'actual success on the merits' rather than a 'substantial likelihood of success on the merits.'" *Id.* In this regard, the plaintiff "must show an imminent threat of irreparable harm for which there is no adequate remedy at law." *Allen v. Dickerson*, 385 So. 3d 1209, 1225 (¶66) (Miss. 2024).

¶59. In this case, no new evidence was presented at the August 31, 2023 hearing on Sacred

23

Heart's motion for a permanent injunction, though Yarbrough's counsel stated at the hearing that Yarbrough and his family had moved to Meridian, Mississippi. Sacred Heart's counsel did not object to Yarbrough's counsel informing the chancellor of this development, noting that this information is relevant to the element regarding whether an injunction would result in any harm to Yarbrough.

¶60. Pursuant to Rule 65(a), "any evidence received upon an application for a preliminary injunction which would be admissible upon the trial on the merits becomes part of the record on the trial and need not be repeated upon a trial." M.R.C.P. 65(a). As such, the chancellor's "Order Granting Permanent Injunction" specified that in the June 26, 2023 "Order Granting Preliminary Injunction," "the [c]ourt carefully set forth its findings . . . that Yarbrough's conduct created a credible threat," after "consider[ing] [the] testimony and documentary evidence admitted at trial and having observed the appearance and demeanor of the parties and their witnesses." The chancellor "adopt[ed] the findings in its previous Order Granting Preliminary Injunction[,] . . . including the analysis of the factors" set forth in that order and discussed above. The chancellor then summarized those findings in the Order Granting Permanent Injunction, as follows:

> [In its order granting preliminary injunctive relief,] [t]he [c]ourt found that Yarbrough was terminated as an employee of the school for failure to comply with administrative requests involving his duties as a maintenance worker at the athletic complex. He became angry in a subsequent meeting with . . . Charles and . . . Hogan—both school administrators. After [Yarbrough] made threatening statements, including "it's about to be ugly," law enforcement was called to escort him off Sacred Heart property. Yarbrough left a voicemail at the administrative level of the Catholic diocese on May 18th claiming that "Sacred Heart had crossed the line and they had met their match" and "that he was done." The voicemail was made an exhibit to the testimony. The third

and most troubling incident involved the sending of flowers to . . . Charles . . . with a message that read: "Matthew 18, May [G]od[']s wrath be just & swift for the pain you have caused to that family. Sec. 97-37-17." A copy of the card was admitted as Trial Exhibit 1. The card was not signed by Yarbrough but he admitted through his testimony that he sent the card along with the flowers to . . . Charles. Upon receipt of the card and flowers, . . . Charles testified that she felt "threatened," "terrified," and "fearful" for herself, her family, students, faculty and staff.

¶61. Based upon these facts and Sacred Heart's legal right to protect its students and staff, the chancellor found that "[t]he actions of Yarbrough show an imminent threat of irreparable harm for which there is no adequate remedy at law" and granted Sacred Heart's request for a permanent injunction against Yarbrough.

¶62. We find no abuse of discretion in the chancellor's findings on the "merits" issue, as substantial credible evidence supports a finding that Sacred Heart proved the merits of its claim that Yarbrough's conduct constituted an imminent threat of irreparable harm for which there is no adequate remedy at law and violated Sacred Heart's legal right to protect its students and staff from this harm.

¶63. We likewise find no abuse of discretion in the chancellor's findings on the remaining three factors a court must weigh in deciding whether to allow injunctive relief, as we have already addressed above. *See T.M.T. LLC*, 310 So. 3d at 1228 (¶38) (recognizing that "the requirements for permanent injunctive relief are substantially the same as a preliminary injunction," other than the "merits" factor). Indeed, the third factor concerning any potential harm to Yarbrough now balances even more in Sacred Heart's favor. Like the chancellor's previous order, the Order Granting Permanent Injunction "does not prohibit Lowry Yarbrough from traveling on the public roads on or near the properties covered under the

25

injunction." Further, because Yarbrough now lives in Meridian, Mississippi (over eighty miles from Hattiesburg), there is an even lesser risk of any harm to Yarbrough.

## CONCLUSION

¶64. In sum, we find that Sacred Heart stated and proved on the merits a "legally cognizable claim" grounded in its right to protect its students and employees from the foreseeable risk of harm based upon Yarbrough's conduct detailed in Sacred Heart's petition for injunctive relief and further supported by the evidence presented at the June 21, 2023 hearing. In light of our deferential standard of review, we find no abuse of discretion in the chancellor granting a preliminary and then a permanent injunction in this case. That is, we find that substantial credible evidence presented at trial and considered by the chancellor support her findings that Sacred Heart proved that (1) Yarbrough's actions presented "an imminent threat" to Sacred Heart's legal right and duty to protect its students and staff; (2) an injunction is necessary in order to prevent irreparable harm to Sacred Heart for which no adequate remedy at law is available, particularly given Yarbrough's "references to weapons on school campuses and vengeful language suggesting that God's wrath be just and swift"; (3) an injunction is in the public interest for these same reasons; and (4) any threatened harm to Sacred Heart outweighs any harm to Yarbrough. Accordingly, we affirm the orders of the chancery court granting a preliminary and then a permanent injunction in this case.

¶65. **AFFIRMED.**

**BARNES, C.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER AND WEDDLE, JJ., CONCUR. WILSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION. ST. PÉ, J., NOT PARTICIPATING.**

26

**WILSON, P.J., DISSENTING:**

¶66. Sacred Heart commenced this action by filing a two-count petition for a restraining order and injunctive relief that stated no substantive cause of action. Count 1 sought a temporary restraining order, and Count 2 sought a preliminary and permanent injunction. The petition did not assert any substantive claim, such as trespass or assault. The petition should have been dismissed because Mississippi law does not authorize a petition for injunctive relief that is not based on some underlying cause of action.

¶67. The Mississippi Supreme Court has held that "*an application for injunctive relief* [*must*] *be predicated upon some legal or equitable claim which will, at some point, proceed to the merits*." *Miss. High Sch. Activities Ass'n v. Hattiesburg High Sch.*, 178 So. 3d 1208, 1213 (¶22) (Miss. 2015) (quoting *In re Bell*, 962 So. 2d 537, 541 (¶12) (Miss. 2007)). Thus, to obtain an injunction, "[t]he plaintiff must file a complaint which alleges some *cognizable claim or cause of action* against the defendant." *Id.* at (¶21) (quoting *Bell*, 962 So. 2d at 541 (¶13)).[10]

---

[10] *See also, e.g.*, *Short v. Williams*, 303 So. 3d 87, 94 (¶23) (Miss. Ct. App. 2020) ("A plaintiff must plead a viable cause of action against a defendant before injunctive relief can be granted."); *Reyes v. N. Tex. Tollway Auth.*, 861 F.3d 558, 565 n.9 (5th Cir. 2017) ("[C]laims [for injunctive relief] are not freestanding; they must be supported by some underlying cause of action."); *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1127 (11th Cir. 2005) ("[A]ny . . . suit for either a preliminary or permanent injunction must be based upon a cause of action, such as a constitutional violation, a trespass, or a nuisance."); *Klay v. United Healthgroup Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004) ("[A]ny . . . suit for a traditional injunction must be predicated upon a cause of action, such as nuisance, trespass, the First Amendment, etc. . . . There is no such thing as a suit for a traditional injunction in the abstract. For a traditional injunction to be even theoretically available, a plaintiff must be able to articulate a basis for relief that would withstand scrutiny under [Federal Rule of Civil Procedure] 12(b)(6) . . . ."); *Starrett v. City of Richardson, Tex.*, 766 F. App'x 108, 112 (5th Cir. 2019) ("[I]njunctions are merely remedies, not causes of action."); *Crook v.*

27

¶68. The petition in this case did not allege any underlying cause of action, such as a trespass or an assault, nor was any claim proved at trial. The evidence showed that after the school terminated Yarbrough's employment, he anonymously sent flowers to the school for Charles with a bizarre and disturbing note. Charles also testified that the school called the police after a prior meeting regarding the termination of Yarbrough's employment because Yarbrough said, "[I]t's about to get ugly," although Charles could not "remember [Yarbrough's] exact verbiage." Finally, Sacred Heart offered a recording of a voicemail that Yarbrough left at the school. Part of the voicemail sounds mildly hostile if it is taken out of context. Yarbrough's full message was as follows:

> Hey, Katherine. It's Friday. Lowry Yarbrough. It's about 3:00. I got a letter from the school. It says either speak to my -- Dr. Ladner or the diocese attorney. I've called for Ladner the past couple of days. I need to speak to the diocese attorney or Dr. Ladner immediately. (662) ***-****.[11] Sacred Heart has crossed the line this time, and they have met their match. I'm done. I need a call back today, please. Thank you.

While these incidents were cause for legitimate concern, none of them constituted a trespass or an assault or gave rise to any "*cognizable claim or cause of action* against [Yarbrough]." *Miss. High Sch. Activities Ass'n*, 178 So. 3d at 1213 (¶21) (quoting *Bell*, 962 So. 2d at 541 (¶13)).[12] Accordingly, there is no basis for the remedy of an injunction.

---

*Galaviz*, 616 F. App'x 747, 753 (5th Cir. 2015) ("[A]n injunction is a remedy that must be supported by an underlying cause of action . . . ."); *Horne v. Time Warner Operations Inc.*, 119 F. Supp. 2d 624, 630 (S.D. Miss. 1999) ("A claim for injunctive relief does not stand alone, but requires a viable underlying legal claim."), *aff'd*, 228 F.3d 408 (5th Cir. 2000).

[11] Yarbrough left his full phone number. The last seven digits are omitted for privacy.

[12] The majority opinion does not identify any claim or cause of action that Sacred Heart established against Yarbrough. The majority opinion cites only Sacred Heart's *duties*

28

¶69. The absence of any underlying cause of action highlights another problem with the issuance of an injunction in this case. To obtain a preliminary injunction, the plaintiff must show "a 'substantial likelihood of success on the merits,'" and "[i]n order to receive a permanent injunction, the plaintiff must prove 'actual success on the merits.'" *T.M.T. LLC v. Midtown Mkt. Wine & Spirits LLC*, 310 So. 3d 1217, 1228 (¶38) (Miss. Ct. App. 2021) (quoting *Winter v. Nat. Res. Def. Council Inc.*, 555 U.S. 7, 32 (2008)). If the plaintiff's complaint fails to even *allege* a cause of action, then how can the plaintiff succeed *on the merits*? If there is no underlying claim, then "success on the merits" *of what*? The requirement of success on the merits plainly refers to an underlying cause of action against the defendant. If the plaintiff fails to succeed on the merits of some underlying cause of action, then a permanent injunction cannot be granted. *Id.* at (¶39).

¶70. Because Sacred Heart failed to plead or prove any cause of action, its petition should have been dismissed, and the judgment of the chancery court should be reversed and rendered. Accordingly, I respectfully dissent.

---

to its students and employees. *Ante* at ¶35. But Sacred Heart's duties to third parties do not give rise to any cognizable rights, claims, or causes of action against Yarbrough. Moreover, "[a] permanent injunction is a remedy potentially available only after a plaintiff can make a showing that some independent legal right *is being infringed—if the plaintiff's rights have not been violated, he is not entitled to any relief, injunctive or otherwise*." *Short*, 303 So. 3d at 94 (¶23) (emphasis added) (quotation marks omitted) (quoting *Waite v. Adkisson*, 282 So. 3d 744, 750 (¶17) (Miss. Ct. App. 2019)). Sacred Heart has not shown that Yarbrough *has* interfered with Sacred Heart's duties to students or employees. Accordingly, even if Sacred Heart's duties to third parties somehow gave it a legally enforceable right against Yarbrough, Sacred Heart still would not be "entitled to any relief, injunctive or otherwise." *Id.*